# DEFENDANTS' EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Auguste J. Burton, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | No.: 08 CV 5777 |
| | ) | Honorable Judge Robert Dow, Jr. |
| **Chicago Police Officers** | ) | |
| **Alfonza Wysinger,** | ) | |
| **JamesGilger # 21151,** | ) | |
| **Officer Deady# 12374,** | ) | |
| **Anderson, M.A. #3129,** | ) | |
| **And Other Unknown Police Officers** | ) | |
| | ) | |
| **Defendant.** | ) | |

### FIRST AMENDED COMPLAINT

The Plaintiff, **AUGUSTE J. BURTON,** by and through his attorney, **PABLO DECASTRO,** makes the following complaint against Chicago Police Officers Wysinger, Gilger, Deady, Anderson, as named above, as well other unknown Chicago Police officers:

### JURISDICTION & VENUE

1.     This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Auguste J. Burton's rights as secured by the United States Constitution.

2.     Thus, this Court has jurisdiction of the action pursuant to 28 U.S.C. Sections 1331, 1332, 1343 and 1367.

4.     Venue is proper under 28 U.S.C. Section 1391(b) as the events giving rise to the claims asserted in this complaint occurred within this District.

**PARTIES**

5.      DEFENDANT OFFICERS and UNKNOWN OFFICERS, were at all relevant times, Chicago police officers employed by The City of Chicago, and acting within the scope of their employment and under color of law.

**FACTS**

6.      On or about June 23, 2007, at or near 5000 W. Ferdinand Street, in the City of Chicago, Illinois, DEFENDANT OFFICERS arrested Auguste J. Burton without a warrant and without probable cause.

7.      Plaintiff was first approached by Defendant Officer Wysinger, who accosted him at gun point, forced him to the ground and placed him under arrest.  Officer Wysinger made material allegations he knew to be false to support his arrest of the Plaintiff, and the resulting prosecution.

8.      Defendant Officers Deady and Anderson, knowing that the arrest was unsupported by probable cause, assisted in the arrest, taking over from officer Wysinger the care and custody of the plaintiff, and transporting him to a secure location within the Chicago Police Department Detective Division.

9.      Once inside the Police station, the plaintiff was taken to a locked interview room and questioned by Defendant Officer Gilger.  During this interrogation, Defendant Officer Gilger slapped the plaintiff several times in the head with an open hand, punched him in the side of his torso several times, and threatened more severe beatings.  This physical abuse occurred while the plaintiff was handcuffed to a ring in the wall, causing injuries to his arm and wrist, in addition to the direct injuries inflicted to his head and body.

10.     As a result of the above physical abuse the defendant was coerced into giving a statement which contributed to his being charged with Attempted Murder, a charge for which he has been held in the custody of the Cook County Jail continuously since June 24, 2007.

11.     Auguste J. Burton has suffered physical and emotional damages as a result of the constitutional violations described above.

### Count I:  Unlawful Search & Seizure

12.     Plaintiff restates paragraphs 1-11 as if fully restated here.

13.     As more fully described in the preceding paragraphs, Defendant Officers seized and arrested Auguste J. Burton without a warrant, without probable cause, and without any other legal justification, in violation of the Fourth Amendment to the United States Constitution.

14.     On information and belief, Officers Dead, Anderson, Gilger, and other Unknown Officers were aware of Officer Wysinger's original misconduct in making the false claims in support of Plaintiff's unlawful arrest, had a reasonable opportunity to intervene, but failed to do so.

15.     On information and belief, Officer Gilger was aware that he allegations against Plaintiff had been fabricated.  Nevertheless Officer Gilger forced Plaintiff to make a statement consistent with the fabricated allegations.

16.     As a direct and proximate result of DEFENDANT OFFICERS and UNKNOWN OFFICERS' misconduct, Auguste J. Burton has suffered harm including physical and emotional damages which will be proven at trial.

3

**WHEREFORE,** Plaintiff prays for judgment against DEFENDANT OFFICERS and UNKNOWN OFFICERS in a fair and just amount sufficient to compensate EDWIN and DARRYL JR. for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

**Count II -- Section 1983 Excessive Force**

17.    Plaintiff restates paragraphs 1-11 as if fully restated here.

18.    As more fully described in the preceding paragraphs, the intentional conduct of DEFENDANT OFFICERS toward Auguste J. Burton. was objectively unreasonable and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

19.    On information and belief, UNKNOWN OFFICERS were aware of DEFENDANT OFFICERS' misconduct, had a reasonable opportunity to intervene, but failed to do so.

20.    As a direct and proximate result of DEFENDANT OFFICERS' use of excessive force and UNKNOWN OFFICERS' failure to intervene, Auguste J. Burton has suffered physical and emotional damages which will be proven at trial.

**WHEREFORE,** Plaintiffs pray for judgment against DEFENDANT OFFICERS and UNKNOWN OFFICERS in a fair and just amount sufficient to compensate EDWIN and DARRYL JR. for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

**Count III:  § 1983 Conspiracy Claim**

21.    Plaintiff restates paragraphs 1-11 as if fully restated here.

22.    DEFENDANT OFFICERS and UNKNOWN OFFICERS impliedly or

4

expressly conspired and agreed to violate Auguste J. Burton's constitutional rights as more fully described above.

      23.      As a direct and proximate result of DEFENDANT OFFICERS and UNKNOWN OFFICERS' conspiracy, Auguste J. Burton has suffered physical and emotional damages which will be proven at trial.

      **WHEREFORE**, Plaintiffs pray for judgment against DEFENDANT OFFICERS and UNKNOWN OFFICERS in a fair and just amount sufficient to compensate EDWIN and DARRYL JR. for the injuries they have suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

      **Plaintiff demands a trial by jury.**

**Auguste J. Burton, Plaintiff**

By:     **/s/ Pablo deCastro**
          Attorney for Plaintiff

Respectfully Submitted,

S/Pablo deCastro, April 15, 2009
**PABLO DECASTRO, ARDC No.** 6224763
Attorney for the Plaintiff
Rascia & DeCastro, Ltd.
650 N. Dearborn, #700
Chicago, IL 60654
312-994-9100 Office
312-994-9105 Fax
pdecastro@rascia-decastro.com; Email
ysierra@rascia-decastro.com; Secondary Email

# **DEFENDANTS' EXHIBIT B**

# **DEFENDANTS' EXHIBIT C**

```
CASE: 07112486301 S  (START OF CASE        )      PAGE: 001 OF  004        PROD
  Defendant Name: AUGUESTE      BURTON            LST APPEAL:
GENERAL INFORMATION
   CB: 016930960 IR: 1114746 SID:        FBI:           RD: HN424371


ATTORNEY INFORMATION      -- NO ATTORNEYS ASSOC W/CASE --


CHARGE INFORMATION

NBR A TYPE CLASS CHAPTER/SECTION                DESCRIPTION
001    F         720-5-8-4                      -


DISPOSITION INFORMATION


062407-
PROBABLE CAUSE TO DETAIN
MYLES RAYMOND
BRANCH  1      RM 100




Enter=Cont PF3=Retn PF7=Bkw PF8=Frw PF9-Appl PF10=Reset PF12=Print Clear=Exit
=> Print The Following Pages PAGE: 001 THRU 004 Destination _____
```

Date: 7/6/2009 Time: 04:47:02 PM

```
CASE: 07112486301 S  (START OF CASE      )      PAGE: 002 OF  004        PROD
 DEFENDANT NAME: AUGUESTE      BURTON          LST APPEAL:
062407-
BAIL AMOUNT SET                        $300000
MYLES RAYMOND
BRANCH  1      RM 100


062407-
MOTION STATE - CONTINUANCE -MS    062507          1166
MYLES RAYMOND
BRANCH  1      RM 100                  1200 PM

062407-
DEF DEMAND FOR TRIAL
MYLES RAYMOND
BRANCH  1      RM 100

062507-
DEF DEMAND FOR TRIAL
SULLIVAN LAURA MARIE
BRANCH 66      RM 101

ENTER=CONT PF3=RETN PF7=BKW PF8=FRW PF9-APPL PF10=RESET PF12=PRINT CLEAR=EXIT
=> PRINT THE FOLLOWING PAGES PAGE: 001 THRU 004 DESTINATION ____
```

```
CASE: 07112486301 S  (START OF CASE        )      PAGE: 003 OF  004      PROD
  DEFENDANT NAME: AUGUESTE     BURTON          LST APPEAL:

062507-
MOTION STATE - CONTINUANCE -MS    071307           1166
SULLIVAN LAURA MARIE
BRANCH 66      RM 101              1200 PM

071307-
MOTION STATE - CONTINUANCE -MS    072007           1166
HENNELLY THOMAS JOSEPH
BRANCH 66      RM 101              1200 PM

071307-
DEF DEMAND FOR TRIAL
HENNELLY THOMAS JOSEPH
BRANCH 66      RM 101


ENTER=CONT PF3=RETN PF7=BKW PF8=FRW PF9-APPL PF10-RESET PF12=PRINT CLEAR=EXIT
=> PRINT THE FOLLOWING PAGES PAGE: 001 THRU 004 DESTINATION ____
```

Date: 7/6/2009 Time: 04:47:04 PM

```
CASE: 07112486301 S  (START OF CASE       )       PAGE: 004 OF  004        PROD
 DEFENDANT NAME: AUGUESTE       BURTON          LST APPEAL:
072007-
DEF DEMAND FOR TRIAL
DESIERTO ISREAL ABAYA
BRANCH 66       RM 101


072007-
SUPERSEDED BY DIRECT INDTMENT                        C001
     07CR15188
DESIERTO ISREAL ABAYA                 00000000
BRANCH 66       RM 101


072007-
TRANSFERRED TO CRIMINAL DIV        080807          1701
DESIERTO ISREAL ABAYA
BRANCH 66       RM 101                 0930 AM

END OF FILE


ENTER=CONT PF3=RETN PF7=BKW PF8=FRW PF9-APPL PF10=RESET PF12=PRINT CLEAR=EXIT
=> PRINT THE FOLLOWING PAGES PAGE: 001 THRU 004 DESTINATION ____
```

```
CASE: 07112486301 S  (START OF CASE        )      PAGE: 004 OF  004       PROD
 DEFENDANT NAME: AUGUESTE       BURTON           LST APPEAL:
072007-
DEF DEMAND FOR TRIAL
DESIERTO ISREAL ABAYA
BRANCH 66       RM 101


072007-
SUPERSEDED BY DIRECT INDTMENT                          C001
    07CR15188
DESIERTO ISREAL ABAYA                 00000000
BRANCH 66       RM 101


072007-
TRANSFERRED TO CRIMINAL DIV           080807          1701
DESIERTO ISREAL ABAYA
BRANCH 66       RM 101                       0930 AM


END OF FILE



ENTER=CONT PF3=RETN PF7=BKW PF8=FRW PF9-APPL PF10=RESET PF12=PRINT CLEAR=EXIT
=> PRINT THE FOLLOWING PAGES PAGE: 001 THRU 004 DESTINATION ____
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 07CR1518801

AUGUESTE     BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

```
720-5\8-4(720-5\9-1)         F X (ATT)ATTEMPT FIRST DEGREE MURDER
720-5\8-4(720-5\9-1)         F X (ATT)ATTEMPT FIRST DEGREE MURDER
720-5\8-4(720-5\9-1)         F X (ATT)ATTEMPT FIRST DEGREE MURDER
720-5\8-4(720-5\9-1)         F X (ATT)ATTEMPT FIRST DEGREE MURDER
720-5\8-4(720-5\9-1)         F X (ATT)ATTEMPT FIRST DEGREE MURDER
720-5\8-4(720-5\9-1)         F X (ATT)ATTEMPT FIRST DEGREE MURDER
720-5/24-1.7(a)              F X     ARMED HABITUAL CRIMINAL
720-5/24-1.2(a)(3)           F X     AGG DISCH FIR/PC OFF/FIREMAN
720-5/24-1.2(a)(2)           F 1     AGG DISCHARGE FIREARM/OCC VEH
```
The following disposition(s) was/were rendered before the Honorable Judge(s):

```
07/27/07 IND/INFO-CLK OFFICE-PRES JUDGE      08/08/07 1701
08/08/07 CASE ASSIGNED                       08/08/07 1727
         BIEBEL, PAUL JR.
08/08/07 DEFENDANT NOT IN COURT              00/00/00
         BIEBEL, PAUL JR.
08/08/07 DEFENDANT IN CUSTODY                00/00/00
         LAWS, MARJORIE C.
08/08/07 PRISONER DATA SHEET TO ISSUE        00/00/00
         LAWS, MARJORIE C.
08/08/07 PUBLIC DEFENDER APPOINTED           00/00/00
         LAWS, MARJORIE C.
08/08/07 DEFENDANT ARRAIGNED                 00/00/00
         LAWS, MARJORIE C.
08/08/07 PLEA OF NOT GUILTY                  00/00/00
         LAWS, MARJORIE C.
08/08/07 MOTION FOR DISCOVERY                00/00/00 F      1
         LAWS, MARJORIE C.
08/08/07 ADMONISH AS TO TRIAL IN ABSENT      00/00/00
         LAWS, MARJORIE C.
08/08/07 CONTINUANCE BY AGREEMENT            09/11/07
         LAWS, MARJORIE C.
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 002

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 07CR1518801

AUGUESTE      BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | | |
|---|---|---|---|
| 09/11/07 DEFENDANT IN CUSTODY | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 09/11/07 PRISONER DATA SHEET TO ISSUE | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 09/11/07 APPEARANCE FILED | | | |
| LAWS, MARJORIE C. | | | |
| 09/11/07 MOTION FOR DISCOVERY | 00/00/00 | F | 2 |
| LAWS, MARJORIE C. | | | |
| 09/11/07 CONTINUANCE BY AGREEMENT | 10/17/07 | | |
| LAWS, MARJORIE C. | | | |
| 10/17/07 DEFENDANT IN CUSTODY | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 10/17/07 PRISONER DATA SHEET TO ISSUE | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 10/17/07 CONTINUANCE BY AGREEMENT | 11/19/07 | | |
| LAWS, MARJORIE C. | | | |
| 11/19/07 DEFENDANT IN CUSTODY | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 11/19/07 PRISONER DATA SHEET TO ISSUE | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 11/19/07 DISCOVERY ANSWER FILED | 00/00/00 | | 1 |
| LAWS, MARJORIE C. | | | |
| 11/19/07 CONTINUANCE BY AGREEMENT | 12/18/07 | | |
| LAWS, MARJORIE C. | | | |
| 12/18/07 DEFENDANT IN CUSTODY | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 12/18/07 PRISONER DATA SHEET TO ISSUE | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 12/18/07 CONTINUANCE BY AGREEMENT | 01/15/08 | | |
| LAWS, MARJORIE C. | | | |
| 01/15/08 DEFENDANT IN CUSTODY | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 01/15/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | | |
| LAWS, MARJORIE C. | | | |
| 01/15/08 CONTINUANCE BY AGREEMENT | 02/19/08 | | |
| LAWS, MARJORIE C. | | | |
| 02/19/08 DEFENDANT IN CUSTODY | 00/00/00 | | |
| CANNON, DIANE G. | | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 003

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 07CR1518801

AUGUESTE     BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 02/19/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| CANNON, DIANE G. | | |
| 02/19/08 CONTINUANCE BY AGREEMENT | 03/27/08 | |
| CANNON, DIANE G. | | |
| 03/27/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 03/27/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 03/27/08 CONTINUANCE BY AGREEMENT | 05/01/08 | |
| LAWS, MARJORIE C. | | |
| 05/01/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 05/01/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 05/01/08 CONTINUANCE BY AGREEMENT | 06/04/08 | |
| LAWS, MARJORIE C. | | |
| 06/04/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 06/04/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 06/04/08 WITNESSES ORDERED TO APPEAR | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 06/04/08 CONTINUANCE BY AGREEMENT | 07/24/08 | |
| LAWS, MARJORIE C. | | |
| 07/24/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 07/24/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 07/24/08 MOTION TO SUPPRESS | 00/00/00 F | 2 |
| STATEMENTS | | |
| LAWS, MARJORIE C. | | |
| 07/24/08 WITNESSES ORDERED TO APPEAR | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 07/24/08 CONTINUANCE BY AGREEMENT | 08/26/08 | |
| LAWS, MARJORIE C. | | |
| 08/26/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 004

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 07CR1518801

AUGUESTE     BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 08/26/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 08/26/08 CONTINUANCE BY AGREEMENT | 09/10/08 | |
| LAWS, MARJORIE C. | | |
| 09/10/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 09/10/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 09/10/08 CONTINUANCE BY AGREEMENT | 10/09/08 | |
| LAWS, MARJORIE C. | | |
| 10/09/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 10/09/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 10/09/08 WITNESSES ORDERED TO APPEAR | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 10/09/08 CONTINUANCE BY AGREEMENT | 11/19/08 | |
| LAWS, MARJORIE C. | | |
| 11/19/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 11/19/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 11/19/08 BOND TO STAND | | $ 300000 |
| D BOND | | |
| LAWS, MARJORIE C. | | |
| 11/19/08 CONTINUANCE BY AGREEMENT | 12/15/08 | |
| LAWS, MARJORIE C. | | |
| 12/15/08 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 12/15/08 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 12/15/08 CONTINUANCE BY AGREEMENT | 01/07/09 | |
| LAWS, MARJORIE C. | | |
| 01/07/09 DEFENDANT IN CUSTODY | 00/00/00 | |
| LAWS, MARJORIE C. | | |
| 01/07/09 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LAWS, MARJORIE C. | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 005

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 07CR1518801

AUGUESTE       BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
```
01/07/09 WITNESSES ORDERED TO APPEAR          00/00/00
         LAWS, MARJORIE C.
01/07/09 CONTINUANCE BY AGREEMENT             02/10/09
         LAWS, MARJORIE C.
02/10/09 DEFENDANT IN CUSTODY                 00/00/00
         HENNELLY THOMAS JOSEPH
02/10/09 PRISONER DATA SHEET TO ISSUE         00/00/00
         HENNELLY THOMAS JOSEPH
02/10/09 WITNESSES ORDERED TO APPEAR          00/00/00
         HENNELLY THOMAS JOSEPH
02/10/09 CONTINUANCE BY AGREEMENT             02/25/09
         HENNELLY THOMAS JOSEPH
02/25/09 DEFENDANT IN CUSTODY                 00/00/00
         HENNELLY THOMAS JOSEPH
02/25/09 PRISONER DATA SHEET TO ISSUE         00/00/00
         HENNELLY THOMAS JOSEPH
02/25/09 CONTINUANCE BY AGREEMENT             03/24/09
         HENNELLY THOMAS JOSEPH
03/24/09 DEFENDANT IN CUSTODY                 00/00/00
         HENNELLY THOMAS JOSEPH
03/24/09 PRISONER DATA SHEET TO ISSUE         00/00/00
         HENNELLY THOMAS JOSEPH
03/24/09 MOTION TO SUPPRESS                   00/00/00 D      2
         STATEMENTS
         HENNELLY THOMAS JOSEPH
03/24/09 CONTINUANCE BY AGREEMENT             04/28/09
         HENNELLY THOMAS JOSEPH
04/28/09 DEFENDANT IN CUSTODY                 00/00/00
         HENNELLY THOMAS JOSEPH
04/28/09 PRISONER DATA SHEET TO ISSUE         00/00/00
         HENNELLY THOMAS JOSEPH
04/28/09 CONTINUANCE BY AGREEMENT             05/12/09
         HENNELLY THOMAS JOSEPH
05/12/09 DEFENDANT IN CUSTODY                 00/00/00
         HENNELLY THOMAS JOSEPH
05/12/09 PRISONER DATA SHEET TO ISSUE         00/00/00
         HENNELLY THOMAS JOSEPH
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 006

PEOPLE OF THE STATE OF ILLINOIS

VS                        NUMBER 07CR1518801

AUGUESTE      BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/12/09 CONTINUANCE BY AGREEMENT                06/18/09
    HENNELLY THOMAS JOSEPH
06/18/09 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH
06/18/09 PRISONER DATA SHEET TO ISSUE            00/00/00
    HENNELLY THOMAS JOSEPH
06/18/09 CONTINUANCE BY AGREEMENT                06/23/09
    HENNELLY THOMAS JOSEPH
06/23/09 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH
06/23/09 PRISONER DATA SHEET TO ISSUE            00/00/00
    HENNELLY THOMAS JOSEPH
06/23/09 CONTINUANCE BY AGREEMENT                07/30/09
    HENNELLY THOMAS JOSEPH
07/30/09 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH
07/30/09 PRISONER DATA SHEET TO ISSUE            00/00/00
    HENNELLY THOMAS JOSEPH
07/30/09 CONTINUANCE BY AGREEMENT                08/31/09
    HENNELLY THOMAS JOSEPH
08/31/09 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH
08/31/09 PRISONER DATA SHEET TO ISSUE            00/00/00
    HENNELLY THOMAS JOSEPH
08/31/09 CONTINUANCE BY AGREEMENT                10/07/09
    HENNELLY THOMAS JOSEPH
10/07/09 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH
10/07/09 PRISONER DATA SHEET TO ISSUE            00/00/00
    HENNELLY THOMAS JOSEPH
10/07/09 NOLLE PROSEQUI                    C003 00/00/00
    HENNELLY THOMAS JOSEPH
10/07/09 NOLLE PROSEQUI                    C004 00/00/00
    HENNELLY THOMAS JOSEPH
10/07/09 CONTINUANCE BY AGREEMENT                10/28/09
    HENNELLY THOMAS JOSEPH
10/28/09 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 007

PEOPLE OF THE STATE OF ILLINOIS

                    VS          NUMBER 07CR1518801

AUGUESTE     BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| Date | Event | Date |
|---|---|---|
| 10/28/09 | PRISONER DATA SHEET TO ISSUE<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 10/28/09 | CONTINUANCE BY AGREEMENT<br>HENNELLY THOMAS JOSEPH | 12/02/09 |
| 12/02/09 | DEFENDANT IN CUSTODY<br>HOWARD CAROL M | 00/00/00 |
| 12/02/09 | PRISONER DATA SHEET TO ISSUE<br>HOWARD CAROL M | 00/00/00 |
| 12/02/09 | CONTINUANCE BY AGREEMENT<br>HOWARD CAROL M | 01/26/10 |
| 01/26/10 | DEFENDANT IN CUSTODY<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 01/26/10 | PRISONER DATA SHEET TO ISSUE<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 01/26/10 | WITNESSES ORDERED TO APPEAR<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 01/26/10 | CONTINUANCE BY AGREEMENT<br>HENNELLY THOMAS JOSEPH | 02/18/10 |
| 02/18/10 | DEFENDANT IN CUSTODY<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 02/18/10 | PRISONER DATA SHEET TO ISSUE<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 02/18/10 | CONTINUANCE BY AGREEMENT<br>HENNELLY THOMAS JOSEPH | 04/06/10 |
| 04/06/10 | DEFENDANT IN CUSTODY<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 04/06/10 | PRISONER DATA SHEET TO ISSUE<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 04/06/10 | WITNESSES ORDERED TO APPEAR<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 04/06/10 | CONTINUANCE BY ORDER OF COURT<br>HENNELLY THOMAS JOSEPH | 04/07/10 |
| 04/07/10 | DEFENDANT IN CUSTODY<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 04/07/10 | PRISONER DATA SHEET TO ISSUE<br>HENNELLY THOMAS JOSEPH | 00/00/00 |
| 04/07/10 | PLEA OF NOT GUILTY<br>HENNELLY THOMAS JOSEPH | C001 00/00/00 |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 008

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 07CR1518801

AUGUESTE      BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

04/07/10 PLEA OF NOT GUILTY                C002 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 NOLLE PROSEQUI                    C003 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 NOLLE PROSEQUI                    C004 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 PLEA OF NOT GUILTY               C005 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 NOLLE PROSEQUI                    C006 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 SPECIAL ORDER                          00/00/00
         07CR1518801 999
         HENNELLY THOMAS JOSEPH
04/07/10 PLEA OF NOT GUILTY                C008 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 NOLLE PROSEQUI                    C009 00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 ENTERED AND CONTINUED                  00/00/00
         HENNELLY THOMAS JOSEPH
04/07/10 CONTINUANCE BY ORDER OF COURT          04/08/10
         HENNELLY THOMAS JOSEPH
04/08/10 DEFENDANT IN CUSTODY                   00/00/00
         HENNELLY THOMAS JOSEPH
04/08/10 PRISONER DATA SHEET TO ISSUE           00/00/00
         HENNELLY THOMAS JOSEPH
04/08/10 TRIAL COMENCED AND CONTINUED           04/09/10
         JURY
         HENNELLY THOMAS JOSEPH
04/09/10 DEFENDANT IN CUSTODY                   00/00/00
         HENNELLY THOMAS JOSEPH
04/09/10 PRISONER DATA SHEET TO ISSUE           00/00/00
         HENNELLY THOMAS JOSEPH
04/09/10 TRIAL COMENCED AND CONTINUED           04/12/10
         HENNELLY THOMAS JOSEPH
04/12/10 DEFENDANT IN CUSTODY                   00/00/00
         HENNELLY THOMAS JOSEPH
04/12/10 PRISONER DATA SHEET TO ISSUE           00/00/00
         HENNELLY THOMAS JOSEPH

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 009

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 07CR1518801

AUGUESTE      BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/12/10 VERDICT OF GUILTY                    C001 00/00/00
      HENNELLY THOMAS JOSEPH
04/12/10 VERDICT OF GUILTY                    C002 00/00/00
      HENNELLY THOMAS JOSEPH
04/12/10 VERDICT OF GUILTY                    C005 00/00/00
      HENNELLY THOMAS JOSEPH
04/12/10 VERDICT OF GUILTY                    C008 00/00/00
      HENNELLY THOMAS JOSEPH
04/12/10 BAIL REVOKED                              00/00/00
      HENNELLY THOMAS JOSEPH
04/12/10 PRE-SENT INVEST. ORD, CONTD TO            00/00/00
      HENNELLY THOMAS JOSEPH
04/12/10 CONTINUANCE BY ORDER OF COURT             05/11/10
      HENNELLY THOMAS JOSEPH
05/11/10 DEFENDANT IN CUSTODY                      00/00/00
      HENNELLY THOMAS JOSEPH
05/11/10 PRISONER DATA SHEET TO ISSUE              00/00/00
      HENNELLY THOMAS JOSEPH
05/11/10 MOTION DEFT - CONTINUANCE - MD            06/15/10
      HENNELLY THOMAS JOSEPH
05/14/10 CASE ADVANCED
      MOTION TO ADVANCE GRANTED
      HENNELLY THOMAS JOSEPH
05/14/10 MOTION DEFT - CONTINUANCE - MD            05/19/10
      HENNELLY THOMAS JOSEPH
05/19/10 DEFENDANT IN CUSTODY                      00/00/00
      HENNELLY THOMAS JOSEPH
05/19/10 PRISONER DATA SHEET TO ISSUE              00/00/00
      HENNELLY THOMAS JOSEPH
05/19/10 BEHAVIOR CLINIC EXAM ORDERED              06/15/10
      HENNELLY THOMAS JOSEPH
05/19/10 CONTINUANCE BY AGREEMENT                  06/15/10
      HENNELLY THOMAS JOSEPH
06/15/10 DEFENDANT IN CUSTODY                      00/00/00
      HENNELLY THOMAS JOSEPH
06/15/10 PRISONER DATA SHEET TO ISSUE              00/00/00
      HENNELLY THOMAS JOSEPH

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 010

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 07CR1518801

AUGUESTE      BURTON

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/15/10 CONTINUANCE BY AGREEMENT                07/14/10
    HENNELLY THOMAS JOSEPH
07/14/10 DEFENDANT IN CUSTODY                    00/00/00
    HENNELLY THOMAS JOSEPH
07/14/10 PRISONER DATA SHEET TO ISSUE            00/00/00
    HENNELLY THOMAS JOSEPH
07/14/10 CONTINUANCE BY AGREEMENT                08/10/10
    HENNELLY THOMAS JOSEPH



I hereby certify that the foregoing has been entered of record on the above captioned case.
Date 07/27/10

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT OF COOK COUNTY

**<u>DEFENDANTS' EXHIBIT D</u>**

706 **FILED**

TIME_____ AM
PM

JUL 2 - 2008

Dorothy Brown
Clerk of the Circuit Court
Criminal Division

Deputy Clerk Signature

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
)
-vs.- )          No. 07-CR-15188
)
AUGUSTE BURTON )

*denied*
*3-24-09*

## MOTION TO SUPPRESS STATEMENTS

Now comes the defendant, AUGUSTE BURTON, by his attorney, EDWIN A.

BURNETTE, Public Defender of Cook County, through SOPHIA J. ATCHERSON, Assistant

Public Defender, and moves this Honorable Court to suppress as evidence herein any and all oral

or written communications, confessions, statements, or admissions, whether inculpatory or

exculpatory, made by the defendant prior to, at the time of, or subsequent to his arrest in the

above-entitled cause.

In support of this motion, the defendant states as follows:

1.      That the defendant was arrested on June 23, 2007, at or near the vicinity of 409 N.

Leclaire Ave., Cook County, Chicago, Illinois.

2.      That subsequently the defendant was transported and interrogated at Area 5 by

law enforcement officials or person or persons acting on their behalf, including but not limited

to:  Detective James Gilger #21151, Detective T. Kolman #20448, Detective R. Cordaro #20680,

Detective VALKNER #20111, Officer Deady #12374, Officer Amorella # 10544, and Assistant

States Attorney Kevin Nolan.

1

3. That prior to interrogation by Area 5 Detectives, the defendant was not:

   a. Informed that he had a right to remain silent;

   b. Informed that anything he might say or do could be used against him in court;

   c. Informed that he had a right to consult with a lawyer;

   d. Informed that he had a right to have a lawyer present with him during the interrogation;

   e. Informed that, if he was indigent, he would nonetheless be provided with a lawyer by the State to be present during his interrogation.

4. That the statements sought to be suppressed were obtained as a result of interrogation that continued after the defendant had elected to consult with an attorney prior to further questioning and the defendant was not provided with an attorney in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

5. That the statements sought to be suppressed were obtained as the product of and as the direct and proximate result of confronting the defendant with certain material misrepresentations in violation of the Fifth and Fourteenth Amendments to the United States Constitution. To wit: The officers who transported the defendant to Area 5 lied to the defendant, telling him that he was under arrest for first degree murder, when in fact, there was no one injured and the most serious potential charge was attempt first degree murder of a police officer.

6. That the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against the defendant and that such statements were, therefore, involuntary in violation of the Fifth and Fourteenth Amendments to the United States Constitution. To wit: During the interrogation, Det. Gilger first struck the defendant on the head

2

several times with his hand, and later struck the defendant on his side several times, all while the defendant had one hand cuffed to the wall of the interrogation room.

7. That the statements sought to be suppressed were obtained as a result of psychological and mental coercion illegally directed against the defendant and that such statements were, therefore, involuntary in violation of the Fifth and Fourteenth Amendments to the United States Constitution. To wit:

 a. After arriving at Area 5, the defendant was placed in a small room with no clock and only a small window that was covered with paper. The defendant was only provided with a small metal bench to sit on and he was handcuffed to the wall until he was taken to be interviewed by the State's Attorney;

 b. The defendant was not given any food to eat or allowed to use the bathroom until after the State's Attorney arrived;

 c. Prior to the interview with the State's Attorney, Det. Gilger threatened to beat defendant further if the defendant's statement to the State's Attorney was not consistent with his earlier oral statement to Det. Gilger.

6. Therefore, that any and all communications, confessions, statements, admissions, or tests executed by the defendant were elicited in violation of his constitutional rights under the Fifth, and Fourteenth Amendments to the United States Constitution.

WHEREFORE, the defendant prays:

1. That the Court conduct a pretrial hearing to determine if the nature of such statements were voluntary, and;

3

2. That this Court suppress as evidence herein any and all communications, confessions, statements, admissions, gestures, or tests, inculpatory or exculpatory, written or oral, made by him at the time of and/or subsequent to him being taken into custody.

Respectfully submitted,

EDWIN A. BURNETTE
Public Defender of Cook County

BY:

SOPHIA J. ATCHERSON
Assistant Public Defender   30295

Auguste Burton
Defendant

4

**DEFENDANTS' EXHIBIT E**

1   STATE OF ILLINOIS )
                      )SS

2   COUNTY OF COOK   )

3

   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

4   CRIMINAL DEPARTMENT/CRIMINAL DIVISION

5          THE PEOPLE OF THE    )
            STATE OF ILLINOIS,   )

6                         )
          PLAINTIFF,        )

7                        )
          VS.             )07CR15188

8                        )
          AUGUSTE BURTON,      )

9

       DEFENDANT.

10

11        REPORT OF PROCEEDINGS had at the hearing

12   of the above-entitled cause, before the HONORABLE

13   THOMAS HENNELLY, on the 24th day of March, A.D.,

14   2009.

15        PRESENT:

16        HON. ANITA M. ALVAREZ,
         State's Attorney of Cook

17        County, by
         MR. MICHAEL FOLOGARIO,

18        Assistant State's Attorney,
         appeared on behalf of the People;

19

20        HON. ABISHI C. CUNNINGHAM, JR.
         Public Defender of Cook County,
         by MS. SOPHIA ATCHERSON,

21        Assistant Public Defender,
         appeared on behalf of the Defendant.

22
       GAIL DUFF, C.S.R./R.P.R.,

23   Official Court Reporter
       Circuit Court of Cook County

24   Criminal Division

                              1

1     Date:    3-24-09

2     Page No:  1 through 131

3                       I N D E X

4                   DX   CX  RDX  RCX

5  Off. Deady

6      by Mr. Falagario   8

7      by Ms. Atcherson      16

8  Det. Kolman

9      by Mr. Falagario  26

10     by Ms. Atcherson     32

11  Det. Gilger

12     by Mr. Falagario  40

13     by Ms. Atcherson     70

14  K. Nolan

15     by Mr. Falagario  79

16     by Ms. Atcherson    104

17            E X H I B I T S

18           MARKED      ADMITTED

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9          THE  CLERK:  Auguste Burton.

10          THE COURT:  How are you, Mr. Burton?

11          THE DEFENDANT:  Okay, sir.

12          MS. ATCHERSON:  We are here today for

13  motion to suppress statement.

14          MS. FALAGARIO:  For the record, Mike

15  Falagario, Assistant State's Attorney's on behalf of

16  the People.

17          MS. ATCHERSON:  Sofia Atcherson, assistant

18  Public Defender.

19          THE COURT:  The motion is pursuant to

20  51-1411 motion to suppress confession my

21  understanding and I'm asking that it comport with

22  the Circuit Court Rule 15-1E for affidavits.

23      Mr. Burton, have you read this motion to

24  suppress statements?

                                        3

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  Raise your right-hand, sir.

3   Do you solemnly swear or affirm that the information

4   contained in the motion to suppress statements to be

5   the truth as far as you know so help you God?

6        THE DEFENDANT:  Yes.

7        THE COURT:  I believe that satisfies

8   Circuit Court rule.

9        The burden is on the People now that that's

10  been done to go forward with the motion.

11       MS. ATCHERSON:  Judge, I have one

12  collateral matter that I want to bring up so I don't

13  forget and that is Mr. Burton is requesting to be

14  allowed access to the law library.

15       He's currently in Division 1 and has not been

16  able to obtain any access, and we would asking for

17  weekly access of if the Court doesn't want to

18  stipulate or state a specific amount of time just

19  access as reasonable.

20       THE COURT:  Let me hear the motion and

21  I'll take that up after we're done.  I'll be honest

22  with you, Mr. Burton, my practice, and you may not

23  be shocked to know that you're not the first one to

24  ask me, but my practice is not to grant those

4

1    motions.

2        I realize that there's some rules and

3    regulations in the Sheriff Department that would

4    indicate you can have library time if the court

5    signs an order but my practice is to allow the

6    sheriff to make those rules and I don't interfere

7    but I will reconsider as we finish the motion today.

8        Are there any preliminary motions with regards

9    to the motion?

10            MS. ATCHERSON:  Motion to exclude.

11            MS. FALAGARIO:  We join in that motion to

12   exclude, Your Honor.

13            THE COURT:  That's granted and comply as

14   to both sides.  Each side responsible for their

15   witnesses.

16        Does either side wish to address the Court in

17   opening statement before I hear evidence?

18            MS. FALAGARIO:  Very briefly.

19            THE COURT:  Even though it's your burden

20   to go forward, it's the defense motion.

21        Do you wish to say anything, Ms. Atcherson,

22   before I hear from the State?

23            MS. ATCHERSON:  Well, Judge, I think the

24   motion speaks for itself.

5

1           THE COURT:  Okay.  You rest on the motion.

2    State.

3           MS. FALAGARIO:  Judge, the allegations in

4    the motion to suppress statements involve, there's

5    several allegations, first of which is that the

6    defendant in .3 that he was not advised of his

7    Miranda warnings prior to interview by the

8    detective.

9           We'll call Detective Tom Kolman who

10   participated in the first interview of the defendant

11   which would have been on June 23, 2007 at

12   approximately 9:15 in the evening.

13          He will demonstrate for you how he administered

14   the Miranda warnings to the defendant.        In .4

15   the allegation is that the defendant invoked his

16   right to an attorney.  Throughout this the defendant

17   stated at the police station he was given his

18   Miranda warnings on three separate occasions.

19          After Detective Kolman he did speak with

20   Assistant State's Attorney Kevin Nolan who will also

21   testify both in oral conversation and then a

22   handwritten statement where at no time did the

23   defendant invoke his right to an attorney.

24          Point 5 alleges material misrepresentation made

6

1     to the defendant by the transporting officers who

2     transported him from the scene of the arrest to Area

3     5 violent crimes.  That transporting officer will

4     testify.  You will hear that he did not make any

5     such statement to the defendant.

6          Point 6 involve physical coercion allegation

7     that Detective Gilger struck the defendant on more

8     than one occasion.

9          Detective Gilger will testify before you today.

10    His testimony will also be corroborated by the

11    testimony of ASA Kevin Nolan.

12         And the last point in the motion, Judge, is .7,

13    psychological and mental coercion.  Again you'll

14    hear from both Detective Gilger and Assistant

15    State's Attorney Kevin Nolan that will describe in

16    detail the defendant's treatment while in police

17    custody so we believe after you hear the evidence,

18    Judge, that these allegations will fail.

19         THE COURT:  Thank you.  You may call your

20    first witness.

21         MS. FALAGARIO:  The People call Chicago

22    Police Officer Kenneth Deady, D-e-a-d-y.

23

24

7

1               **KENNETH DEADY,**

2    called as a witness, having been first duly sworn,

3    was examined and testified as follows:

4               **DIRECT EXAMINATION**

5    BY MS. FALAGARIO:

6        Q    Officer, in a loud and clear voice, could

7    you please state your full name?

8        A    Officer Deady, first name is Kenneth.  The

9    last name id Deady, D-e-a-d-y, star number 12374.

10       Q    Where are you employed, sir?

11       A    Chicago Police Department.

12       Q    How long have you been employed as a

13   Chicago Police Department?

14       A    Seven and a half years.

15       Q    Where are you currently assigned?

16       A    Right now, Area 5, gang enforcement.

17       Q    Now, I'm going to direct your attention

18   back to June 23, 2007, were you on duty and working

19   as a Chicago police officer on that day?

20       A    Yes.

21       Q    What was your assignment on June 23 of

22   2007?

23       A    I was 15th District gang officer.

24       Q    As a 15th District gang officer, what

8

1   shift were you working on June 23?

2       A   6:00 p.m. to 2:30 in the morning.

3       Q   Were you working alone or with a partner?

4       A   With a partner.

5       Q   What's your partner's name?

6       A   Officer Michael Anderson.

7       Q   You and your partner, Officer Anderson,

8   what were your duties that evening?

9       A   We were gang enforcement that night in the

10  15th District.

11      Q   Were you working in uniform or in

12  plain-clothes?

13      A   Plain-clothes.

14      Q   Were you and your partner assigned to a

15  car?

16      A   Yes.

17      Q   Was that a marked police car or unmarked

18  police vehicle?

19      A   Unmarked vehicle.

20      Q   I'm going to direct your attention now to

21  approximately 8:00 o'clock that evening on June 23,

22  were you in the vicinity of Austin High School at

23  approximately 8:00 o'clock in the evening?

24      A   Yes, we were.

9

1     Q   Is Austin High School in the boundary of

2 the 15th District?

3     A   Yes.

4     Q   Was anyone with you?

5     A   My partner Officer Anderson.

6     Q   What were you and your partner doing at

7 approximately 8:00 p.m.?

8     A   We were standing outside of our vehicle

9 talking to other officers.

10    Q   As you were standing outside your vehicle,

11 did you hear anything?

12    A   Yes.

13    Q   What did you hear?

14    A   Heard numerous shots being fired.

15    Q   After you heard numerous shots being

16 fired, what did you do?

17    A   We then got back into our vehicle and

18 started heading in the general direction of the

19 shots.

20    Q   As you're heading in the general direction

21 of the shots that you heard, what happens?

22    A   There was, we are monitoring on radio

23 there was a call of shots fired at 400 block of

24 Leclaire.

1    Q    Did you go to the 400 block of Leclaire?

2    A    Yes.

3    Q    Approximately, how long did it take to get

4    from Austin High school to the 400 block of

5    Leclaire?

6    A    Approximately two to three minutes.

7    Q    When you arrived at that location, 400

8    block of Leclaire, what observations did you make?

9    A    When we arrived I observed my commander,

10   Commander Wysinger, detaining an individual on the

11   ground.

12   Q    The individual that was being detained on

13   the ground, do you see him in the courtroom today?

14   A    Yes, I do.

15   Q    Could you please point and describe an

16   article of clothing that he's wearing today?

17   A    The individual next to defense counsel

18   wearing the brown shirt and pants.

19        THE COURT:  Any dispute that the officer

20   identified your client?

21        MS. ATCHERSON:  No.

22        THE COURT:  Let the record reflect in

23   Court identification.

24        MS. FALAGARIO:  Thank you, Your Honor.

11

1   BY MS. FALAGARIO:

2       Q    Commander Wysinger, who was detaining the

3   defendant, where were they when you arrived on the

4   scene?

5       A    They were in the street.

6       Q    What did you do when you made these

7   observations?

8       A    I then got out of my vehicle and went to

9   assist my commander.

10      Q    How did you assist your commander?

11      A    By placing handcuffs on the individual.

12      Q    When you say the individual, are you

13  referring to the defendant Auguste Burton?

14      A    Yes.

15      Q    What happened after you handcuffed the

16  defendant?

17      A    He was then escorted back to our vehicle

18  and placed in the back seat.

19      Q    What did you do after you put the

20  defendant in the back seat of your car?

21      A    He was then placed in the back seat.  I

22  then stood outside the vehicle waiting for further

23  instructions.

24      Q    As you, did you at some point receive

12

1    further instruction?

2       A    Yes, I did.

3       Q    And what was the instructions that you

4    received?

5       A    Instructions were to take Mr. Burton to

6    the Area 5 being 25th District.

7       Q    Did you take the defendant to Area 5?

8       A    Yes.

9       Q    How did you take him?

10       A    He was transported in our vehicle.

11       Q    Approximately how long did it take you to

12    go from the 400 block of Leclaire to the police

13    station at Area 5?

14       A    Approximately 10 to 15 minutes.

15       Q    Now, during that 10 to 15 minutes that

16    you're driving him to the police station, did you

17    speak with the defendant?

18       A    No, I did.

19       Q    Did your partner have a conversation with

20    the defendant?

21       A    No, he did not.

22       Q    Had your partner spoken to the defendant

23    or had any conversation with him on the scene at

24    Leclaire?

1     A    No, I did not.

2     Q    Did you tell the defendant that he was

3 under arrest for first degree murder?

4     A    No, I did not.

5     Q    Did your partner tell the defendant that

6 he was under arrest for first degree murder?

7     A    No, he did not.

8     Q    When you get to the police station at Area

9 5, what did you do?

10    A    He was taken upstairs to the detective's

11 office.  He was then placed in one of their

12 interview rooms.

13    Q    When you say he, again you're referring to

14 the defendant Augueste Burton?

15    A    Correct.

16    Q    Did you and your partner place him in that

17 interview room?

18    A    Yes, we did.

19    Q    Was the interview room located on the

20 second floor at that police facility?

21    A    Yes.

22    Q    What did you do when you placed him in the

23 interview room?

24    A    He was searched again.  He was then

14

1      handcuffed in the interview room.

2          Q    At that point did you have a conversation

3      with the defendant?

4          A    No, I did not.

5          Q    At that point did your partner have a

6      conversation with the defendant?

7          A    No, he did not.

8          Q    At any time while at the police station

9      did you or your partner tell the defendant that he

10     was under arrest for first degree murder?

11         A    No, we did not.

12         Q    Was anyone killed in the incident?

13         A    No.

14         Q    What did you do after the defendant was

15     secured in the interview room at Area 5?

16         A    We then waited, we then waited outside in

17     the office area for everyone to return from the

18     scene the detectives.

19         Q    Officer, at any time in your presence did

20     you hear anyone tell the defendant that he was under

21     arrest for first degree murder?

22         A    No, I did not.

23              MS. FALAGARIO:  No further questions, Your

24     Honor.

15

```
 1              THE COURT:  Sophia, do you any questions?

 2              MS. ATCHERSON:  Yes, Judge.

 3                    CROSS-EXAMINATION

 4   BY MS. ATCHERSON:

 5         Q    Officer, you indicated that you were

 6   working in area of Austin High School?

 7         A    Yes, ma'am.

 8         Q    And that before hearing this call over the

 9   radio you were already proceeding to this area where

10   you heard shots fired?

11         A    Yes, in that general direction.

12         Q    You indicated that you're working

13   enforcement that evening?

14         A    I was gang officer in the 15th District

15   that night yes.

16         Q    You were actually assigned to narcotics

17   unit at that time?

18         A    No, 15th District.  At the time I was, we

19   were working as a tactical and gang officer, I was a

20   gang officer in the 15th District.

21         Q    Okay.  And you indicate you were working

22   with a partner Officer Anderson?

23         A    Yes.

24         Q    Were any officers working with you at that
```

                              16

1   time?

2       A    We were just out there talking to another

3   set of officers.   I believe might have been beat

4   car, beat car being uniform car.

5       Q    Do you recall who those other set of

6   officers were?

7       A    No.

8       Q    Do know if those other set of officers

9   also accompanied you to the scene of the shots fired

10  call?

11      A    No, I can't recall that, ma'am.

12      Q    Now, you said it took you approximately

13  two to three minutes to get to the scene?

14      A    Yes.

15      Q    And when you arrived, where did you park

16  your vehicle, were you the driver or the passenger?

17      A    I was the passenger.

18      Q    Where did your partner park the vehicle?

19      A    We parked right, came off Kinsey off of

20  Kinsey on to Leclaire we were parked in the street.

21      Q    Do you know approximately what address on

22  Leclaire you were parked?

23      A    I don't recall the address, ma'am.

24      Q    Was it somewhere in the 400 block?

17

1  A  Yes, it was.

2  Q  Leclaire then is that 400 block is the

3 southern street would be 400 block Leclaire,

4 Leclaire is north south running street, is that

5 correct?

6  A  Yes.

7  Q  And the street then to the south is

8 Kinsey?

9  A  Kinsey is a east and west street runs

10 along the railroad track.

11  Q  So if you're proceeding southbound on the

12 400 block, would that be Kinsey?

13  A  As we were coming off of Laramie, we off

14 of Laramie we're leading northbound on Laramie.

15  We went on Kinsey, heading eastbound on Kinsey

16 and Kinsey to Leclaire; and we're facing northbound

17 on Leclaire.

18  Q  And the street then north of Kinsey or the

19 northern boundary of that 400 block is Ferdinand, is

20 that correct?

21  A  That's correct.

22  Q  You said that when you arrived at the 400

23 block of Leclaire, you observed Commander Wysinger,

24 then Commander Wysinger detained an individual who

18

1     you've identified as Augueste Burton?

2         A     That's correct.

3         Q     They were in the street?

4         A     Yes.

5         Q     Mr. Burton was on the ground?

6         A     Yes.

7         Q     And when you arrived, were there any other

8     officers other than the commander you saw on the

9     scene?

10        A     My partner, we were the first car on the

11    scene and as it went on there were more vehicles

12    showing up almost simultaneously.

13        Q     You indicated that you assisted Commander

14    Wysinger by handcuffing Mr. Burton?

15        A     That's correct.

16        Q     And commander, that's because the

17    commander didn't have handcuffs with him?

18        A     I don't know, ma'am.

19        Q     He was in plain clothes?

20        A     Yes.

21        Q     He was in street clothes?

22        A     Yes.

23        Q     To your knowledge was commander actually

24    on duty at that time?

                                            19

1     A    I don't know, ma'am.  He wasn't on duty.

2     Q    And you indicated that you, after cuffing

3  Mr. Burton, you placed him in the back seat of your

4  vehicle?

5     A    Yes.

6     Q    Where was your partner at that time?

7     A    He was with Commander Wysinger.

8     Q    At the time you placed Mr. Burton in the

9  back seat of the vehicle, were there other officers

10  on the scene?

11     A    When we put him in the back seat of the

12  car you're asking?

13     Q    Yes.

14     A    As we were, as I have putting him in the

15  back seat other vehicles were arriving on the scene.

16     Q    Now, you said that your partner was with

17  Commander Wysinger.  Commander Wysinger was your

18  commander at that time?

19     A    Yes, ma'am.

20     Q    Did you speak with Commander Wysinger on

21  the scene?

22     A    No, I did not.

23     Q    Did you speak with other officers about

24  what had lead to Mr. Burton being detained by

20

1    Commander Wysinger?

2       A    I didn't talk to any other officers on the

3    scene except the detectives.  When I was by the car,

4    I didn't talk to anybody.

5       Q    So is it your testimony, let me just  ask

6    you, did you speak to anyone before you left the

7    scene about why Mr. Burton had been detained?

8          MS. FALAGARIO:  Objection to the

9    relevance.

10         THE COURT:  He can answer.

11    BY THE WITNESS:

12       A    What was the question again?

13  BY MS. ATCHERSON:

14       Q    Had you spoken to any of the officers on

15    the scene about why Mr. Burton had been detained?

16       A    As officers were there yes, there was a

17    discussion about what happened.  There was Commander

18    Wysinger was involved in an incident.

19       Q    And you were on the scene about 30 minutes

20    before transporting Mr. Burton, would that be fair

21    to say?

22       A    About 30 minutes yes.

23       Q    You stated you did not speak to Mr. Burton

24    prior to leaving the 400 block of Leclaire, did you

1    see any other officers speak to Mr. Burton?

2        A    No, I did not, ma'am.

3        Q    After leaving 400 block of Leclaire you

4    indicated you drove to Area 5?

5        A    That's correct.

6        Q    And that took you ten to 15 minutes?

7        A    Yes, with traffic and everything yes.

8        Q    And your partner was also in the car?

9        A    Yes.

10       Q    By the time you left the scene, you know

11   that there's at least an allegation that Mr. Burton

12   has been involved in a shooting with Commander

13   Wysinger?

14       A    Yes.

15       Q    Is it your testimony today that you didn't

16   speak to him at all during that ride?

17       A    No ma'am, I did not.

18       Q    And your partner didn't say anything?

19       A    No, he did not.

20       Q    Once you arrived at Area 5, you indicated

21   that you took Mr. Burton upstairs to interview room

22   on the 2nd floor?

23       A    Correct.

24       Q    And the interview room you said he was

22

1    searched again?

2         A    Yes.

3         Q    And he was cuffed to a wall?

4         A    He was handcuffed.  I don't recall if it

5    was to a ring on the wall or to a bench.  I don't

6    recall where he was handcuffed but he was handcuffed

7    in the room.

8         Q    So in that room there was either a ring on

9    the wall or a metal bar on the bench?

10        A    Yes.

11        Q    And he was cuffed to one of those two?

12        A    Yes.

13        Q    Did you speak with him at all while he was

14   being cuffed in the room, interview room?

15        A    No.

16        Q    And there's no clock on the wall in this

17   interview room?

18        A    No.

19        Q    There was no window you could see out of

20   the interview room?

21        A    Just on the door.

22        Q    Windows were covered with paper?

23        A    Yes.

24        Q    On the door?

23

1  A  Yes.

2  Q  You said that you waited outside in the

3 office area after placing Mr. Burton in this room,

4 how long did you, well, let me ask you this, did any

5 other officers come into contact with Mr. Burton as

6 you were waiting outside in the office area?

7  A  Meaning besides detectives or no nobody,

8 I'm sorry.

9  Q  Who was the first police officer that you

10 saw make contact with Mr. Burton after you placed

11 him in the room?

12  A  The detectives when they came back in the

13 scene.

14  Q  Do you know what direction specifically?

15  A  No ma'am, I don't.  There was a lot.

16  Q  Would you say one or more than one person

17 go into the room?

18  A  I can't recall how many people went into

19 the room, ma'am.

20  Q  Do you recall, do you know if it was more

21 than one?

22  A  It could have been one officer that walked

23 in there.  I'm not exactly sure.

24  Q  Prior to detectives entering that room,

24

1   did you go into that room?

2       A    No, I did not.

3       Q    Did you at any time allow Mr. Burton while

4   you were watching him to use the bathroom?

5       A    That was, no, I didn't, I didn't do any of

6   that.

7       Q    Approximately how much time past between

8   the time you placed in that room and the time you

9   first saw detectives enter the room?

10      A    Maybe approximately between another 30

11  minutes.

12           MS. ATCHERSON:  Nothing further.

13           THE COURT:  Redirect?

14           MS. FALAGARIO:  No further questions.

15           THE COURT:  Thank you, Officer.  You may

16  step down.  Call your next witness.

17                    **DETECTIVE KOLMAN,**

18  called as a witness, having been first duly sworn,

19  was examined and testified as follows:

20                    **DIRECT EXAMINATION**

21  BY MS. FALAGARIO:

22      Q    Detective Kolman, could you please state

23  your full name and spell your last name?

24      A    Thomas Kolman, K-o-l-m-a-n.

25

1       Q       What is your star number and unit of

2    assignment?

3       A       Star 20448.  My unit of assignment is Area

4    5, violent crimes.

5       Q       How long have you been assigned as a

6    detective at Area 5?

7       A       Six years.

8       Q       How long have you worked with the Chicago

9    Police Department?

10      A       Fifteen years.

11      Q       Directing your attention to the date of

12   June 23, 2007, were you on duty as a Area 5 Violent

13   Crimes detective during that evening?

14      A       Yes.

15      Q       Were you working alone or with a partner?

16      A       I had a partner.

17      Q       And what was your partner's name on that

18   evening?

19      A       Detective Robert Cordaro, C-o-r-d-a-r-o.

20      Q       That evening did you and your partner at

21   approximately 8:00 o'clock in the evening respond to

22   a call of a shooting which occurred on the 400 block

23   of North Leclaire?

24      A       Yes.

26

1     Q     Did you learn that that shooting involved

2     15th District Police Commander Alphonso Wysinger?

3     A     Yes.

4     Q     Approximately what time that evening on

5     June 23 did you get to the 400 block of North

6     Leclaire?

7     A     I believe we arrived about 8:30.

8     Q     And 8:30 would have been in the evening?

9     A     Yes, 8:30 in the evening.

10     Q     Can you describe what was taking place at

11     that location at about 8:30 that evening?

12     A     There was multiple police units on the

13     scene, interviews, canvass of the area.  There were

14     marking off the evidence.  I don't think the mobile

15     crime lab had arrived quite yet on my arrival.

16     Q     Were there other detectives from Area 5

17     Violent Crime on the scene at that time?

18     A     Yes, there were several.

19     Q     Was one of those detectives a James

20     Gilger?

21     A     Yes.

22     Q     Now, at some point while you were on the

23     scene, did you and your partner receive a specific

24     assignment regarding the shooting?

27

1       A       Yes.  We were advised by our sergeant at

2    that point to leave and go back to Area 5 because

3    the offender had been taken into custody at the

4    scene.

5       Q       And what was your role as far as going

6    back to Area 5?

7       A       We relocated to Area 5 to conduct an

8    interview with the offender.

9       Q       Did you and your partner after receiving

10   that assignment go to Area 5?

11      A       Yes.

12      Q       What did you do when you arrived back at

13   Area 5?

14      A       Upon arrival we went into interview room

15   F.

16      Q       Now, interview room F, where is that

17   located?

18      A       That's upstairs on the second floor in the

19   detective division.

20      Q       That's Area 5 Violent Crimes?

21      A       Yes.

22      Q       When you entered interview room F, did you

23   enter with anyone else?

24      A       Yes.  Detective Carter was my partner that

28

1    day with me.

2         Q    Did you interview or was anyone present in

3    the room?

4         A    Yes.

5         Q    How many people were in the room?

6         A    One.

7         Q    Do you see that one individual that was in

8    interview room F that evening in the courtroom

9    today?

10        A    Yes.

11        Q    Would you please point and describe an

12   article of the clothing?

13        A    Gentleman at the table in the tan.

14             MS. FALAGARIO:  May the record reflect

15   in-Court identification of the defendant, Auguste

16   Burton?

17             THE COURT:  Yes.

18   BY MS. FALAGARIO:

19        Q    What did you do when you entered the

20   interview room?

21        A    I introduced myself and my partner and I

22   advised him of his Miranda rights.

23        Q    When you say I advised the defendant of

24   his Miranda rights, how did you that?

                                  29

1    A    By memory.

2    Q    Can you demonstrate how you told the

3  defendant his Miranda rights that evening?

4    A    Yes.  I told him he had the right to

5  remain silent.

6       If he gave up that right to remain silent,

7  anything he said can and will be used against him in

8  a court of law.

9       I told him he had the right to an attorney.  If

10  he can not afford an attorney one will be appointed

11  for him at no costs.

12       After I finished that, I asked him did he

13  understand what I had just told him.

14    Q    Did the defendant indicate to you whether

15  he understood those rights?

16    A    He said he did understand.

17    Q    After he indicated that he understood his

18  rights, what did you ask him next?

19    A    I asked him what happened on Leclaire and

20  Ferdinand earlier in the evening.

21    Q    Did he make a statement to you regarding

22  what had happened on Leclaire earlier that evening?

23    A    Yes.

24    Q    Approximately how long did the defendant

30

1    speak with you and your partner regarding what

2    happened earlier that evening?

3        A    Probably lasted 30 or 40 minutes the

4    interview.

5        Q    Was anyone else present during that

6    conversation?

7        A    No.

8        Q    Were you the first detective that

9    interviewed the defendant in this case?

10       A    Yes.

11       Q    Did you or your partner have any further

12   conversation with the defendant later that evening?

13       A    No.

14       Q    Was the Detective Gilger present at Area 5

15   while you interviewed the defendant at 9:15 that

16   evening?

17            MS. ATCHERSON:  Objection.

18            THE COURT:  What's your objection?

19            MS. ATCHERSON:  Personal knowledge.

20            THE COURT:  Well, if he knows.

21   BY THE WITNESS:

22       A    Detective Gilger hadn't arrived.  He was

23   still processing the crime scene.

24

31

1          THE COURT:  Objection will be sustained.

2     You just said he wasn't there.

3          MS. FALAGARIO:  Can I have one moment,

4     Judge, please?

5          THE COURT:  Sure.

6          MS. FALAGARIO:  No further questions, Your

7     Honor.

8          THE COURT:  Cross?

9                    **CROSS-EXAMINATION**

10    BY MS. ATCHERSON:

11    Q     Detective, you said when you arrived there

12    were several other law enforcement personnel on the

13    scene including other detectives, correct?

14    A     That's correct yes.

15    Q     Detective Gilger was one of the detectives

16    on the scene when you arrived?

17    A     He was on the scene yes.

18    Q     And Detective Gilger is actually the lead

19    detective?

20    A     He was the lead detective yes.

21    Q     Now, you said that you had been instructed

22    to return to Area 5 for the purpose of conducting an

23    interview with Mr. Burton?

24    A     Correct.

                              32

1     Q    And you located Mr. Burton at the Area

2  room 5 of Area 5, violent crimes, correct?

3     A    Detective did, correct.

4     Q    When you went into that room you found

5  Mr. Burton alone?

6     A    Yes.

7     Q    And he was handcuffed to the wall?

8     A    I don't recall if he was handcuffed or

9  not.  I doubt that he was.

10     Q    Is it your testimony that you were, it was

11  just you and your partner that entered the room?

12     A    Yes.

13     Q    That was approximately 9:15?

14     A    Correct.

15     Q    You don't know who may have had contact

16  with Mr. Burton prior to you interviewing him at

17  9:15?

18     A    Correct.

19     Q    Now, you indicated, you advised Mr. Burton

20  of his Miranda rights by memory, is that correct?

21     A    Correct.

22     Q    He was not shown anything in writing

23  regarding his rights?

24     A    No.

33

1     Q    He was not asked to sign anything to

2   verify that he understood his rights?

3     A    Not by me no.

4     Q    Was he advised or requested by anyone in

5   your presence at the time that you spoke to him

6   indicated that he understood his rights in writing?

7     A    Not in writing no.

8     Q    There are forms available to you that

9   contain the rights and contained in Area IV an

10  individual to indicate whether they wish to speak to

11  you after being advised of their rights, correct?

12    A    Chicago police officer police forms?

13    Q    Yes.

14    A    Not the ones that we use on a regular

15  basis no.

16    Q    But there are forms that exist?

17    A    Only for handwritten purposes if they are

18  giving handwritten statements.

19    Q    You didn't tape record your conversation

20  with Mr. Burton?

21    A    No.

22    Q    You didn't videotape the conversation you

23  had with Mr. Burton?

24    A    No.

34

1     Q    You did take notes?

2     A    Yes.

3     Q    Notes were reflected on your general

4  progress report?

5     A    Correct.

6     Q    Other than your general progress report is

7  there any other document that memorialized the

8  conversation that you had, that you prepared that

9  you had with Mr. Burton?

10     A    No.

11     Q    Without going into the specifics of the

12  conversation that you had with Mr. Burton, would it

13  be fair to say that in the conversation that he had

14  with you, there was a discussion about an incident

15  that happened on Ferdinand prior to anything

16  happening on Leclaire within Commander Wysinger?

17     A    Yes.

18     Q    Would it be fair to say that the

19  conversation that you had regarding the incidence on

20  Ferdinand involved another individual by the

21  nickname of Party, P-a-r-t-y or P-a-r-d-y?

22     A    Yes.

23     Q    Now, you indicated that there were several

24  other detectives at the scene, were you aware

35



1    whether there was other detectives had arrived at

2    the scene at the time you concluded your interview?

3        A    I don't recall any of the primary

4    detectives there after the interview was concluded.

5        Q    Would it be fair to say that with regards

6    to any incident that took place on Leclaire with

7    Commander Wysinger that there was a denial as to any

8    shooting at Commander Wysinger?

9        A    I don't understand.

10       Q    I'm sorry.  With regard to the interview

11   that had you with Mr. Burton, would it be fair to

12   say that there was any admission of Mr. Burton to

13   shooting at Commander Wysinger?

14       A    Did he say he actually shot at him?

15       Q    Correct.

16       A    No.

17       Q    Based on the information that you had

18   learned regarding a initial confrontation with

19   another individual this Party individual on

20   Ferdinand, there were efforts made to try to

21   identify that Party, correct?

22       A    Yes.

23       Q    That included compiling a photo array?

24       A    Yes.

36

1     Q    And were you present when that photo array

2  was shown to Mr. Burton?

3     A    It was not a photo array.  It was several

4  photos of individuals that had used that nickname

5  from our data warehouse system.

6     Q    And you're aware that based on the photos

7  that were shown to Mr. Burton that Party was

8  identified?

9     A    Correct.

10    Q    At that time that was the only individual

11  who was identified from the series of photos that

12  Mr. Burton was shown, correct?

13    A    Correct.

14    Q    And the photo array was conducted along

15  with Detective Valkner, V-a-l-k-n-e-r?

16    A    No.  At that point it was still my partner

17  Detective Cordaro.

18    Q    Do you know if Officer Valkner was present

19  for the photo array, excuse me, Detective Valkner?

20    A    He was one of the primary detectives

21  assigned to the case.

22    Q    Would it be fair to say that after

23  finishing your interview with Mr. Burton that you

24  spoke with Detective Gilger?

1    A    Yes.

2    Q    About the content of the conversation that

3 he had with Mr. Burton?

4    A    Yes.

5    Q    And do you recall if you spoke with

6 Detective Valkner about the content of the

7 conversation?

8    A    They are partners so perhaps they were

9 together when I spoke to them.

10    Q    During that conversation that you had with

11 Mr. Burton, there was no mention of an individual by

12 the name of Jeffrey Joe according to your report,

13 correct?

14    A    Correct.

15    Q    Are you aware of who the next people to or

16 detective to talk to Mr. Burton would have been

17 after yourself and Detective Cordaro?

18    A    I'd only be guessing but most likely it

19 would have been lead detective which would be

20 Detective Gilger.

21    Q    After informing Detective Gilger and

22 perhaps his partner, Detective Valkner, about the

23 content of your conversation with Mr. Burton, what

24 further involvement did you have with this

38

1 investigation?

2  A That would be about it.

3  Q Did you continue to work on the

4 investigation at the station or elsewhere after your

5 interview with Mr. Burton?

6  A No.  There was nothing left that needed to

7 be handled so we were pretty much done with it.

8  Q During your, during the time that you were

9 present with Mr. Burton, did this include any food?

10  A If he had asked for something we would

11 have tried to accommodate him.

12  Q But you didn't offer him any food?

13  A I don't recall.

14  Q You didn't take him to the bathroom during

15 that time?

16  A If he requested it, I would have brought

17 him.

18  Q Now, would it be fair to say that there's

19 nothing in your GPR that indicate that you ever took

20 him to the bathroom or provide him with food?

21  A No, I didn't document that.

22  Q Is it true that -- strike that.

23  MS. ATCHERSON:  Nothing further.

24  THE COURT:  Any redirect, Counsel?

1            MS. FALAGARIO:  No, Your Honor.

2            THE COURT:  Thank you.  You may step down.

3            **DETECTIVE JAMES GILGER,**

4  called as a witness, having been first duly sworn,

5  was examined and testified as follows:

6                    **DIRECT EXAMINATION**

7  BY MS. FALAGARIO:

8        Q      Detective, in a loud, clear voice please

9  state your full name spell your last name?

10       A      Detective James Gilger, star 21151.

11       Q      You work for the Chicago Police

12  Department?

13       A      I do.

14       Q      What capacity do you work for the Chicago

15  Police Department?

16       A      I'm a detective assigned Area 5 Violent

17  Crimes.

18       Q      How long have you been assigned to Area 5,

19  Violent Crimes?

20       A      Approximately 12 years.

21       Q      How long have you been with the Chicago

22  Police Department?

23       A      Twenty-one years.

24       Q      Were you working as a detective in Area 5

                          40

1    Violent Crimes on June 23rd of 2007?

2        A    I was.

3        Q    What shift were you working on that day?

4        A    I was working third shift starting at 4:30

5    in the afternoon working to 1 a.m.

6        Q    Were you working alone or with a partner?

7        A    I had a partner.

8        Q    Who was your partner on that date?

9        A    Detective John Valkner, V-a-l-k-n-e-r,

10    star no. 20111.

11        Q    Detective Gilger, I'm going to direct your

12    attention to approximately 8:05 that evening on June

13    23, 2007, did you receive an assignment?

14        A    Assigned to police involved shooting in

15    the 15th District at 440 North Leclaire.

16        Q    What did you do after you received that

17    assignment?

18        A    Immediately left Area 5 and proceeded to

19    400 North Leclaire.

20        Q    Did you go to that location with your

21    partner, Detective Valkner?

22        A    Yes, I did.

23        Q    About what time did you and your partner

24    arrive at the 400 block of Leclaire?

41

1     A    It was about 8:30 p.m.

2     Q    When you arrived, when and your partner

3  arrived on that block, what observations did you

4  make?

5     A    Large group of police cars on the scene,

6  police officers.  They were putting yellow crime

7  scene tape up and there was a group of people,

8  citizens on the street.

9     Q    After making those observations, what did

10  you do?

11     A    The first person I talked to was the

12  assigned officers, the uniform officers that were

13  compiling the report of this investigation.

14     Q    Were those officers able to tell you what

15  had happened?

16     A    Yes.

17     Q    What information did you learn at that

18  time?

19     A    I learned that Commander Wysinger,

20  commander of the 15th District, had been the officer

21  involved in the shooting.

22     I also learned that subject had been placed

23  under arrest.  I learned that a gun had been

24  recovered, and I learned that additional victim had

42

1   been shot.

2       Q    Was that an individual by the name of

3   Michelle Cooper?

4       A    That's correct.

5       Q    Now, after your conversation with the

6   officers, what did you and your partner do?

7       A    We talked to the victim in this case

8   Commander Wysinger.

9       Q    Did that conversation or that interview

10  take place on the scene at that location of 440

11  North Leclaire?

12      A    That's correct.  It lasted about 30

13  minutes.

14      Q    Now, the offender that was involved in

15  this incident, was he on the scene, did you have

16  occasion to have contact with him on the scene?

17      A    No, I did not.

18      Q    Did you learn how he was transported away

19  from the scene?

20      A    I subsequently learned that one of the

21  arresting officers had transported to Area 5

22  headquarters.

23      Q    Now, after you and your partner

24  interviewed the victim, Commander Alphonso Wysinger,

43

1   what did you do next?

2       A    Since we were the assigned detectives, we

3   had to conduct a scene investigation at this point.

4       Q    What is a scene investigation, what's

5   entailed in a investigation?

6       A    We have to document any evidence that's

7   found at the scene, conduct interviews with

8   witnesses at the scene and which also entail

9   contacting the mobile crime lab who we meet with and

10  they recovered any firearms evidence or any

11  firearms.

12      Q    In this case did you do all of the

13  following things that you just described?

14      A    That's correct.

15      Q    Approximately how long it take to conduct

16  the scene investigation?

17      A    That was about two hours.

18      Q    At the conclusion of the two hours or at

19  the conclusion of the scene investigation, what did

20  you do next?

21      A    We returned to Area 5 headquarters.

22      Q    Is that the first time had you returned to

23  Area 5 after going to the 400 block of North

24  Leclaire?

                              44

1  A  That's correct.

2  Q  During those two hours, did you have any

3 contact whatsoever with the offender that has been

4 placed into custody?

5  A  No.

6  Q  Approximately what time did you arrive

7 back at Area 5?

8  A  It was about 10:30 p.m.

9  Q  Again that's on June 23, 2007, correct?

10  A  That's correct.

11  Q  What did you do when you got back to the

12 area?

13  A  Well, I spoke to the first person I talked

14 to was Detective Kolman and Cordaro who informed me

15 that the subject in this investigation, arrested in

16 this investigation had given a statement and was

17 being cooperative.

18  Q  Were you present at all for that initial

19 statement?

20  A  No.

21  Q  Where were you at the time that Detective

22 Kolman, Cordaro spoke to the defendant?

23  A  At 440 North Leclaire.

24  Q  That was the scene of the shooting?

45

1    A    That's correct.

2    Q    Did you learn whether the defendant gave

3  details to Detective Kolman and Cordaro about what

4  happened earlier that evening?

5    A    Yes.  He gave specific details of his

6  account of what happened.

7    Q    Now, as you were at Area 5 after had you

8  returned to Area 5, did anyone else arrive at the

9  police station?

10    A    Cook County Assistant State's Attorney

11  Kevin Nolan showed up shortly after I got there.

12    Q    And again what time did you approximately

13  arrive?

14    A    I got there about 10:30 p.m. he showed up

15  shortly after I did.

16    Q    Did you have occasion to have a

17  conversation with Kevin Nolan about the case?

18    A    Yes.  Basically I just informed him of the

19  progress of the investigation at that point and

20  informed him that there were witnesses that were

21  there and he suggested that we sit down and

22  interview all the witnesses.

23    Q    Did you and Kevin Nolan sit down and

24  interview all the witnesses that were present at the

46

1    police station?

2        A    That's correct.

3        Q    Did you participate with Kevin Nolan with

4    the interview of a Charlene Cooper?

5        A    That is correct.

6        Q    Did you and he interview a witness by the

7    name of Coretta Jones?

8        A    Yes, that is correct.

9        Q    Did both of you interview a witness by the

10   name of Artherin (phonetic) Kelly?

11       A    That's correct.

12       Q    Arnold Wysinger?

13       A    Yes.

14       Q    Michelle Cooper?

15       A    That's correct.

16       Q    Did you also in the presence of Kevin

17   Nolan participate in an interview of the victim in

18   this case Commander Alphonso Wysinger?

19       A    That's correct.

20       Q    So there were six interviews that you did

21   at the police station?

22       A    That's correct.

23       Q    Approximately, how long did it take you

24   and the Assistant State's Attorney to conduct these

47

1  six interviews?

2      A    About an hour and a half.

3      Q    At the conclusion of all of these

4  interviews, what did you do next concerning the

5  investigation?

6      A    We interviewed Augueste Burton.

7      Q    Directing you approximately to

8  1:00 o'clock in the morning, which would have been

9  now June 24, 2007, did you participate in an

10  interview of Augueste Burton?

11      A    That's correct.

12      Q    Do you see him in the courtroom today?

13      A    Yes.

14      Q    Could you please point to him and describe

15  what he's wearing today?

16      A    Seated to the right of his attorney with

17  Cook County DOC uniform on.

18          MS. FALAGARIO:  May the record reflect in

19  Court identification of the defendant Augueste

20  Burton?

21          THE COURT:  Yes.

22  BY MS. FALAGARIO:

23      Q    1:00 o'clock in the morning, where did you

24  see the defendant Augueste Burton?

48

1      A      He was in an interview at Area 5

2   headquarters.

3      Q      Describe what happened when you saw him at

4   1:00 o'clock in the morning?

5      A      He was seated on the bench inside the room

6   and myself and Assistant State's Attorney Kevin

7   Nolan walked into the room.

8      Q      Was anyone else present in the room with

9   the defendant Augueste Burton?

10     A      No.

11     Q      Did anyone accompany you and Assistant

12   State's Attorney as you entered the room?

13     A      No.

14     Q      Can you describe for us the interview room

15   out?

16     A      There's a door leading into the room which

17   has got a small thin mirror on the door.  As you

18   walk into the room, which was about 10 by 12,

19   there's a metal bench bolted to one of the walls in

20   the back of the interview room.

21     Q      What happened as you and assistant State's

22   attorney walked into the room?

23     A      First, we all introduced ourselves to

24   Augueste Burton and at that point Kevin Nolan stated

49

1    prior to speaking to you Mr. Burton, I'm going to

2    advise you of your Miranda rights.

3.       Q    Did Kevin Nolan, in fact, in your presence

4    advise the defendant of his Miranda rights?

5        A    He did.

6        Q    And how did he do that?

7        A    Well, after he gave him each Miranda

8    rights, he would ask Augueste Burton, do you

9    understand that particular right.  Augueste Burton

10   stated he did.  He went on to the next Miranda right

11   until he was finished.

12       Q    Did the defendant indicate in your

13   presence that he understood each and every right

14   that Kevin Nolan had told him?

15       A    Yes.

16       Q    Did Kevin Nolan ask the defendant anything

17   at that time?

18       A    He asked Augueste Burton if you would be

19   willing to tell us what happened earlier this

20   evening.

21       Q    What did the defendant say?

22       A    He stated I do yes.

23       Q    Did you participate in an interview with

24   Kevin Nolan of the defendant about what had happened

50

1   earlier that evening?

2       A    That's correct.

3       Q    Approximately how long did the interview

4   take?

5       A    Thirty minutes.

6       Q    Was anyone else present for that interview

7   during that 30 minutes other than yourself, Kevin

8   Nolan, and the defendant Augueste Burton?

9       A    No.

10      Q    Had you interviewed the defendant at any

11  time prior to this interview with the Assistant

12  State's Attorney?

13      A    No.

14      Q    Was detective -- can you describe the

15  manner of the interview, how the interview was

16  conducted?

17      A    Basically, Kevin Nolan asked about what

18  happened earlier.

19          Augueste Burton related his account of the

20  incident, gave specific details and if there was any

21  questions that came up he would answer the question

22  put to him by Kevin Nolan.

23      Q    Can you describe the defendant's demeanor

24  during the interview?

51

1      A    He was calm, wasn't agitated or raising

2    his voice.  He was acting just like we're just

3    sitting down having a conversation.

4      Q    At the conclusion of the interview, what

5    happened next?

6      A    We both left the room together.

7      Q    What did you do?

8      A    Well, he stepped outside the room, Kevin

9    Nolan said he has to make a couple of phone calls.

10   At that point I was tending to some other issues up

11   at Area 5.

12     Q    As you were tending other issues at the

13   area, did you notice anything or what happened next?

14     A    Kevin Nolan walked into room by himself

15   and spoke to Augueste Burton privately.

16     Q    What happened next?

17     A    About five minutes later, he came out and

18   stated Augueste Burton was willing to give a

19   handwritten statement with regard to investigations,

20   is there an office or room that we can sit down

21   where I can actually write this statement out.  And

22   I said yeah there's a room right around the corner.

23   In this room there's a desk and chairs.  I believe

24   it's a perfect room to sit down where he would be

52

1    able to write it out.

2         Q    Was there a desk in the interview room

3    where you had spoken to the defendant?

4         A    No.

5         Q    So what did you do next?

6         A    Basically escorted Auguste Burton from

7    interview room F into the aggravated battery mission

8    office and there's an inner office.  At that point

9    we all sat down in chairs.  They're three chairs in

10   side the room.  Kevin Nolan sat behind the desk.

11   Auguste Burton sat right next to him.  I sat on the

12   other side of the desk.

13        Q    Was there anyone else in the room besides

14   the three of you?

15        A    No.

16        Q    Directing you to approximately 1:40 in the

17   morning on June 24, 2007, what did Kevin Nolan begin

18   to do?

19        A    Took a handwritten statement from Auguste

20   Burton.

21        Q    Were you present as ASA Kevin Nolan wrote

22   out that statement?

23        A    Yes, I was.

24        Q    Was that statement after it was written

1    out was that reviewed with the defendant and

2    Augueste Burton?

3        A    It was.

4        Q    Were you present for the review of that

5    document?

6        A    I was.

7        Q    Did you, in fact, yourself sign the

8    handwritten statement?

9        A    I did.

10       Q    Did you initial the statement in any

11   areas?

12       A    Where there were any corrections made, I

13   put a handwritten statement.

14       Q    Did you ever conduct an interview of the

15   defendant outside the presence of the Assistant

16   State's Attorney Kevin Nolan?

17       A    No.

18       Q    Did you ever interview the defendant

19   without advising him of his Miranda rights?

20       A    No.

21       Q    Did the defendant ever ask you or tell you

22   that he wanted an attorney?

23       A    No.

24       Q    Did the defendant every in your presence

1    invoke his right to an attorney?

2         A    No.

3         Q    Did you ever tell the defendant that he

4    was under arrest for first degree murder?

5         A    No.

6         Q    Did you, were you present when anyone told

7    him that he was under arrest for first degree

8    murder?

9         A    No.

10        Q    Did you in any way strike the defendant on

11   the head several times with your hand?

12        A    No.

13        Q    Did you strike him at any time?

14        A    No.

15        Q    Did you punch him on the side several

16   times?

17        A    No.

18        Q    Did you punch him anywhere on his body?

19        A    No.

20        Q    Did you slap him against the head with

21   open hands?

22        A    No.

23        Q    Did you ever tell him that he'd better

24   start talking to you?

55

1     A    No.

2     Q    Did you make threats to the defendant

3   saying that he would tell State's attorney what you

4   wanted him to say?

5     A    No.

6     Q    Did you threaten the defendant to sign the

7   statements?

8     A    No.

9     Q    Did you physically and mentally coerce the

10  defendant into giving a statement against himself on

11  what you wanted him to say?

12    A    No.

13    Q    Did you tell the defendant that he'd

14  better not say a word to the State's attorney about

15  him being beaten?

16    A    No.

17    Q    Did you tell the defendant that if he told

18  the State attorney anything besides the story that

19  you wanted him to tell you would make it hard for

20  his family to identify him?

21    A    No.

22    Q    Was the defendant allowed to use the

23  washroom while he was at the area?

24    A    Yes.

56

1      Q    Do you recall specifically whether he used

2  the washroom?

3      A    I do.  After they did gunshot residue test

4  on his hands, he asked to use the bathroom, at that

5  point we let him use the bathroom.

6      Q    Did you tell the defendant before the

7  interview with the State's attorney that you would

8  beat him further if the statement did not remain

9  consistent?

10     A    No.

11     Q    Did you make any threats whatsoever to the

12  defendant?

13     A    No.

14     Q    Did anyone in your presence threaten the

15  defendant?

16     A    No.

17     Q    Now, at the conclusion of the handwritten

18  statement, were any photographs taken?

19     A    Yes.  Assistant State's Attorney Kevin

20  Nolan took a Polaroid photograph of Augueste Burton.

21     Q    Were you present when that Polaroid

22  photograph was taken?

23     A    I was.

24         MS. FALAGARIO:  Judge, I'm marking

1   People's Exhibit No. 1, People's Exhibit No. 1A.

2           THE COURT:  What's 1 -- oh, never mind.

3           MS. FALAGARIO:  Showing it to counsel.

4   May I approach?

5           THE COURT:  Yes.

6   BY MS. FALAGARIO:

7       Q    Detective, I'm going to show you what I

8   marked as People's Exhibit No. 1, can you describe

9   what that is?

10      A    This is the original handwritten statement

11  with a Polaroid picture attached to the phone taken

12  by ASA Kevin Nolan on June 24, 2007 at 140 hours.

13          MS. FALAGARIO:  For the record, Your

14  Honor, the Polaroid photograph is marked People's

15  Exhibit No. 1A, the statement marked People's

16  Exhibit No. 1.

17  BY MS. FALAGARIO:

18      Q    How many pages is the statement?

19      A    Seven pages.

20      Q    And is that the statement that you were

21  present for that Kevin Nolan took from the defendant

22  Augueste Burton.

23      A    That's correct.

24      Q    Did that statement contain your signature?

58

1      A    It does.

2      Q    Does it also contain the signatures of the

3  ASA as well as the defendant Auguste Burton?

4      A    It does.

5      Q    Is that statement in the same or

6  substantially the same condition as when you saw it

7  on the morning of 2007?

8      A    Exactly the same.

9      Q    And People's Exhibit No. 1A, the

10  photograph, does that -- who is that a photograph

11  of?

12      A    It's a photograph of Auguste Burton

13  standing up next to a yellow wall.

14      Q    Is that yellow wall within the aggravated

15  battery mission office where the statement was

16  taken?

17      A    It was.

18      Q    Does the defendant appear in the same or

19  does the photograph truly and accurately reflect how

20  at the defendant appeared at the police station?

21      A    It does.

22      Q    Detective, after the felony charges were

23  approved in this case, what happened with the

24  defendant?

59

1        A      He was brought back to the 25th District

2    lock up.

3        Q      And in the lock up, what is the procedure

4    for the lock up after charges are approved?

5        A      They process arrestee downstairs which

6    means fingerprinting and photographing.

7        Q      Were, in fact, photographs taken of the

8    defendant while he was processed in the lock-up?

9        A      That's correct.

10            MS. FALAGARIO:   Judge, I'm marking

11   People's Exhibit 2, which is six photographs that

12   are marked People's Exhibit No. 2A through 2F,

13   showing it to counsel.

14           May I approach the witness again, Your Honor?

15            THE COURT:   Yes.

16   BY MS. FALAGARIO:

17       Q      Detective Gilger, I'm going to show you

18   first what's marked People's Exhibit No. 2A, who is

19   that photograph of?

20       A      It's a photograph of Augueste Burton

21   facing forward facing front.

22       Q      Can you identify People's Exhibit No. 2B?

23       A      It's the same picture of Augueste Burton

24   but facing right profile.

60

1    Q    Showing you what's marked People's Exhibit

2  No. 2C?

3    A    It's a picture of the abdomen of Augueste

4  Burton with blue boxer shorts on.

5    Q    People's Exhibit 2, what is depicted in

6  this paragraph?

7    A    It's a picture of Augueste Burton facing

8  forward with tattoo above his right on his right

9  chest, and he's holding a shirt that exposed that

10  tattoo.

11    Q    Showing you People's Exhibit No. 2E,

12  describe what you see?

13    A    It's a picture of the inside of his right

14  forearm and it's a cross with the lettering RIP

15  above the top of the cross.

16    Q    And lastly People's Exhibit No. 2F, who is

17  shown?

18    A    Basically the same, looks like the same

19  exact picture essentially.

20    Q    Now, these six photographs were all of

21  those photographs taken on the morning of June 24,

22  2007 in the lock-up?

23    A    That's correct.

24    Q    Do those photographs, People's Exhibit No.

1   2A through 2F truly and accurately reflect how the

2   defendant appeared while he was in police custody

3   for this case?

4       A    That's correct.

5            MS. FALAGARIO:  No further questions, Your

6   Honor.

7            THE COURT:  All right.  Give me a minute.

8                    **CROSS-EXAMINATION**

9   BY MS. ATCHERSON:

10      Q    Detective, you had indicated that you on

11  the scene of your assignment you first went to the

12  scene?

13      A    That's correct.

14      Q    400 block of Leclaire?

15      A    That's correct.

16      Q    And while at the scene you indicated that

17  you spoke to Commander Wysinger?

18      A    Yes.

19      Q    And at that time Mr. Burton was no longer

20  on the scene, is that correct?

21      A    I'm not exactly sure what time he left but

22  he left shortly after I arrived there yes.

23      Q    You indicated while on the scene you were

24  physically in charge of making sure the

                           62

1    investigation at the scene was conducted properly?

2        A    That's correct.

3        Q    That included identifying areas where

4    evidence to be recovered?

5        A    That's correct.

6        Q    Notifying the crime lab?

7        A    Also took photographs.

8        Q    Correct.

9        And interviewing witnesses?

10       A    That's correct.

11       Q    And in addition to the scene on the 400

12   block of Leclaire, there was also a scene on

13   Ferdinand, correct?

14       A    Yes.  I don't know if they ever recovered

15   any bullets from that area but we went down to the

16   scene from what we learned from Commander Wysinger

17   where he heard shots.  He thought he heard shots

18   from down east of that location.

19       Q    And that would be east of the location

20   would be in the direction Waller, correct?

21       A    Which is the next street east yes.

22       Q    You are aware that there were several

23   piecings from a 9 millimeter weapon recovered from

24   the address of approximately 500 Lawler?

63

1       A    I do have to review my report.  You want

2    to show me your report.

3       Q    You're referring to your supplemental

4    report?

5       A    That's correct.

6       Q    I'm marking this Defense's Exhibit No. 1.

7    I'm showing you what appears to be a clear closed

8    supplementary report, that report that would refresh

9    your recollection?

10      A    It would.

11           THE COURT:  Is this Defense Group 1?

12           MS. ATCHERSON:  Yes, Judge, this is a 24

13   page supplementary report.

14      BY THE WITNESS:

15      A    Yes.  Inventory number 11011540, ten fired

16   FC 9 millimeter Luger cartridge cases recovered from

17   the rear yard of 500 North Waller.

18   BY MS. FALAGARIO:

19      Q    You are aware that the weapon allegedly

20   possessed by Mr. Burton at the time was a 357

21   revolver?

22      A    That's correct.

23      Q    You did learn that there was a weapon

24   recovered in the 400 block of Leclaire?

64

1     A     That's correct.

2     Q     But there was not any ballistic evidence

3   regarding that weapon recovered from that block?

4     A     Well, there was a revolver so all shells

5   were still inside of that.

6     Q     There weren't any fired bullets recovered?

7     A     There weren't any fired bullets recovered

8   from the 357.

9     Q     Regarding that weapon?

10     A     No.

11     Q     You said that after completing your

12   investigation at the scene you proceeded to Area 5?

13     A     That is correct.

14     Q     And you spoke with the detective,

15   Detective Cordaro and Detective Kolman who had

16   already conducted an interview with Mr. Burton?

17     A     That's correct.

18     Q     You learned the contents of that

19   interview?

20     A     Yes.

21     Q     And you believe it was approximately 10:30

22   when you arrived at Area 5?

23     A     Yes.

24     Q     Based on that, let me ask you, did you

65

1    know of any other interviews other than the

2    interview conducted by Detectives Kolman and Cordaro

3    that took place prior to your arrival?

4        A    Interviews with who?

5        Q    With Burton, excuse me.

6        A    There were no other interviews conducted

7    with Mr. Burton.

8        Q    Now, you indicated that ASA Kevin Nolan

9    showed up after shortly after your arrival?

10       A    Yes.

11       Q    That there were also several other

12    witnesses from the scene at Area 5 for the

13    interview?

14       A    Yes.

15       Q    You realized that Charlene Cooper was

16    present to be interviewed?

17       A    She was.

18       Q    Is it your testimony that you were

19    personally involved in the interview of Charlene

20    Cooper?

21       A    With ASA Kevin Nolan.

22       Q    Did you prepare a general progress report

23    regarding your interview of Charlene Cooper?

24       A    Again, I'd have to review the reports, the

66

1   one you showed to me.

2       Q    Are you indicating that you would need to

3   review the supplementary report that was shown to

4   you previously, that four page report?

5       A    Well, let me ask you, what specifically

6   interview are you talking about with Charlene

7   Cooper, the one with the State's attorney or the one

8   prior to that?

9       Q    I'm trying to -- there was more than one

10  interview conducted with Ms. Cooper?

11      A    Yes.

12      Q    Okay.  Is it my understanding that there

13  was an interview conducted with Ms. Cooper prior to

14  your interview with Ms. Cooper with Assistant

15  State's Attorney Nolan?

16          MS. FALAGARIO:  Objection, Your Honor,

17  relevance.

18          THE COURT:  How is his interview with Ms.

19  Charlene Cooper relevant to whether or not his will

20  was overborn when he made the statement?

21          MS. ATCHERSON:  I'm trying to establish

22  what information the officer had at the time of the

23  interview conducted with Mr. Burton.

24          THE COURT:  There's nothing in your

67

1   allegation, I mean in your motion that there's

2   something that he gleaned from Ms. Cooper that had

3   an affect on the statement that was taken from your

4   client.  It may be a trial issue but has nothing to

5   do with whether or not this was a voluntary

6   statement or not.

7       Objection is sustained.

8       MS. ATCHERSON:  There's a version of

9   events that Mr. Burton is claiming was basically

10  constructed by this detective then it is relevant

11  then I believe.

12      THE COURT:  I am going by the way is in

13  your written document and what is in your written

14  document is there's nothing in there about an

15  interview with Ms. Copper that affect on the

16  voluntariness of the statement.  Objection is

17  sustained.

18      Your allegations in this motion are very

19  specific and that's what the State is obligated to

20  respond to.

21  BY MS. ATCHERSON:

22      Q    Now, would it be fair to say that the

23  witnesses that you interviewed with detective,

24  Assistant State's Attorney Nolan had already been

68

1    interviewed by other detectives?

2        A    Yes.  As well as myself.

3        Q    Now, you filled out general progress

4    reports detailing oral conversation that you had

5    with Mr. Burton?

6        A    Can you repeat the question.

7        Q    You had an oral interview with Mr. Burton

8    prior to the handwritten statement?

9        A    That is correct.

10       Q    You filled out a general progress report

11   regarding the first oral interview?

12       A    With Assistant State's Attorney Kevin

13   Nolan yes.

14       Q    You were the lead detective in this case?

15       A    That's correct.

16       Q    Your testimony today is that you didn't

17   speak with Mr. Burton before the State's attorney

18   arrived?

19       A    That is correct.

20       Q    You didn't speak with Mr. Burton before

21   your interviews where the assistant State's attorney

22   was present?

23       A    I did not speak to him until 0100 hours on

24   the 24th of June 2007.

69

```
 1          Q    Now, at the time you first came in contact

 2    with Mr. Burton, you indicated he was in room F?

 3          A    That's correct.

 4          Q    That's an interview room with no clock in

 5    the room?

 6          A    No.

 7          Q    It's a fairly small room?

 8          A    About 10 by 12.

 9          Q    And there isn't a window that one could

10    see out of in that room?

11          A    There isn't.

12          Q    Where is the window located?

13          A    It's in the door.

14          Q    That window was covered with paper, is

15    that correct?

16          A    It wasn't that night.

17          Q    Is it now covered with paper?

18          A    You mean like today I couldn't tell you.

19          Q    There's a metal bench in the room?

20          A    Yes.

21          Q    And there's a ring on the wall?

22          A    Yes, bolted to the wall yes.

23          Q    And at the time that you entered that room

24    Mr. Burton was handcuffed to that ring?
```

70

1      A     He was not handcuffed.

2      Q     Now, at the time of your initial

3    interview, the oral interview with Mr. Burton, did

4    you give him any written document containing his

5    Miranda rights for him to review?

6      A     No.

7      Q     Did you have him sign anything indicating

8    that he understood his rights at that time?

9      A     Well, Assistant State's Attorney Kevin

10   Nolan read him his Miranda rights.  I did not.

11     Q     That would be no you personally didn't

12   give him anything in writing to sign to acknowledge

13   that he understood his rights?

14     A     No.

15     Q     Now, it's your testimony that there were

16   interviews with witnesses prior to interviewing

17   Mr. Burton, did you prepare any GPRs regarding those

18   interviews?

19     A     No.

20     Q     Now, when you first arrived at Area 5, you

21   indicate that you spoke to Detective Kolman and

22   Cordaro?

23     A     Yes.

24     Q     Pursuant to the information that you

1   learned from them, there was a series of photos

2   shown to Mr. Burton?

3       A    I'm not exactly sure when they showed

4   these photos.  I know we were trying to identify the

5   subjects he was shooting at and he, subsequently,

6   did identify one of two guys.  I had nothing to do

7   with that.

8       Q    Okay.  You are aware at that time that you

9   came to Area 5 that there were two people that he

10  said he shot at?

11      A    Yes.  I learned that after speaking with

12  Detective Kolman and Cordaro.

13      Q    One of those individuals was a person by

14  the nickname of Pardy, P-a-r-t-y or P-a-r-d-y?

15      A    Yes.

16      Q    You learned that Mr. Burton was actually

17  able to identify the subject that he believed to be

18  called Party from a series of photos that he was

19  shown?

20      A    Yes.

21      Q    This was all prior to you actually

22  interviewing him?

23      A    Yes.

24      Q    And since he was only able to identify one

72

1    at that time, there were further efforts being made

2    to locate the second individual, correct?

3        A    At the end of that investigation that

4    evening, we did not know who that second subject was

5    so the answer to your question I guess is no.

6        Q    Well, the time that he was shown a photo

7    array isn't it true that there was another person by

8    the name of Jeffrey?

9        A    Right.

10       Q    Who you were looking for?

11       A    At the end of the investigation, we had

12   not identified him.

13       Q    You hadn't identified who that was but you

14   knew at the time that he was shown a series of

15   photos this was the second individual allegedly

16   involved in the shooting with Mr. Burton by the name

17   of Jeffrey Joe?

18            MR. FAERMARK:  Objection to relevance,

19   Your Honor.

20            THE COURT:  Sustained.

21   BY MS. ATCHERSON:

22       Q    Now, you indicated that you allowed

23   Mr. Burton to use the washroom after he requested

24   that following a gunshot residue test?

73

1    A    Yes.

2    Q    Did you document that anywhere that he was

3    allowed to use the washroom?

4    A    We did but we didn't put the time on the

5    record no.

6    Q    Did you personally give Mr. Burton

7    anything to eat prior to State's attorney arriving

8    and interviewing him?

9    A    No.

10    Q    Are you aware he was provided with any

11    food or drink prior to your involvement with

12    Mr. Burton?

13    A    He was given a cigarette to smoke and

14    juice to drink.

15    Q    Do you know who provided that?

16    A    I don't.

17    Q    Do you know if there was any report or

18    document anywhere of that being done?

19    A    I'm not sure.

20    Q    Now, you stated that there was a time

21    after the initial interview when both you and ASA

22    Nolan left the room?

23    A    With your client?

24    Q    Yes.

74

1      A    Yes.

2      Q    You say you had other things to take care

3 of?

4      A    Yes.  I tended to some other issues.

5      Q    And to your knowledge did anyone else have

6 contact with him during that time?

7      A    No.

8      Q    You said that you had other things to take

9 care of, what were those other things?

10     A    I'm sure they were trying to get witnesses

11 rides home and maybe just talking to other

12 detectives on this case.

13     Q    Isn't it true that Mr. Burton requested a

14 lawyer?

15     A    No.

16     Q    Isn't it true that Mr. Burton asked not to

17 speak with you without the presence of a lawyer?

18     A    No.

19     Q    Isn't it true that you had an opportunity

20 to speak with Burton outside the presence of

21 Assistant State's Attorney Kevin Nolan?

22     A    No.

23     Q    Isn't it true that you hit Mr. Burton with

24 an open-handed on his head several times?

75

1      A    No.

2      Q    Isn't it true that you also hit him in the

3   ribs several times?

4      A    No.

5      Q    Detective, you are aware that Mr. Burton

6   filed a complaint with the Office of Professional

7   Clearance or what is now known as the Independent

8   Police Review Authority?

9      A    I'm aware of that.

10     Q    That there's an ongoing investigation?

11     A    That's correct.

12     Q    That you're named as the person who

13  against whom he's making these allegations?

14     A    Yes.

15     Q    One of the individuals?

16     A    Yes.

17     Q    And you were aware before your testimony

18  today the allegations contained in his complaint?

19     A    That's correct.

20     Q    And you're aware before your testimony

21  today of the allegations contained in the motions

22  that's before the Court today?

23     A    Can you repeat the question please.

24     Q    You had an opportunity to review the

76

1   allegations that are contained in the motion that

2   we're here for today?

3       A    I never read your motion, Counselor.

4       Q    Did you have an opportunity to speak with

5   State's attorney before your testimony today?

6       A    Yes.

7       Q    They did not make you aware of the

8   allegations?

9       A    You are stating do I know what's inside

10  your motion?  I don't know exactly what's inside

11  your motion.

12      Q    You are aware of the motions concerned

13  today?

14      A    Yes.

15      Q    Allegations made against yourself today?

16      A    Yes.

17      Q    Prior to today, you as part of the

18  investigation with the Independent Police Review

19  Authority, you had already been required to fill out

20  to from memo?

21      A    A report yes.

22      Q    That's to answer allegations contained in

23  the complaint of Mr. Burton?

24      A    That's correct.

                                            77

1     Q    Would it be fair to say if the allegations

2    of the motion here today or the allegations of his

3    complaint with the Independent Police Authority

4    Review were true that your job would be in jeopardy,

5    correct?

6    A    That's correct.

7    MS. ATCHERSON:  I have nothing further.

8    THE COURT:  Redirect?

9    MS. FALAGARIO:  No, Your Honor.

10    THE COURT:  All right.  Thank you.  You

11    may step down.

12    THE WITNESS:  Thank you.

13    MS. FALAGARIO:  Our next witness is Kevin

14    Nolan.  He's on the third floor.  Could we take five

15    minutes to get him on the third floor.

16    THE COURT:  Sure.  Was he available today?

17    MS. FALAGARIO:  Yes.

18    THE COURT:  Court's in recess.

19    (WHEREUPON, the above-entitled

20    cause was passed and later

21    recalled.)

22    THE COURT:  Court's back there session.

23    Bring out the defendant.  All right.  Everybody's

24    present.  Call your next witness, State.

1          MS. FALAGARIO:  Thank you.  People call

2    Kevin Nolan.

3                    **KEVIN NOLAN,**

4    called as a witness, having been first duly sworn,

5    was examined and testified as follows:

6                    **DIRECT EXAMINATION**

7    BY MS. FALAGARIO:

8          Q    Sir, could you please state your full name

9    and spell your last name?

10         A    Yes.  My name is Kevin Nolan, N-o-l-a-n.

11         Q    What do you do for a living?

12         A    I'm an Assistant State's Attorney.

13         Q    In Cook County?

14         A    Yes.

15         Q    Are you licensed to practice law in

16   Illinois?

17         A    Yes, I am.

18         Q    How long have you been so licensed?

19         A    Since November of 2001.

20         Q    Where is your current assignment within

21   the Cook County State's Attorney's Office?

22         A    Currently assigned to Felony Trial

23   Division.

24         Q    In what capacity?

                                                    79

1      A    I'm an assistant State's attorney, third

2   chair in Judge Claps' courtroom.

3      Q    I'm directing your attention to June 23,

4   2007, were you employed as a Cook County State's

5   Attorney at that time?

6      A    Yes, I was.

7      Q    Were you assigned to a different unit in

8   the office?

9      A    Yes, I was.

10     Q    What unit were you assigned to on June 23

11  of 2007?

12     A    I was assigned to the felony review unit.

13     Q    Do you recall what shift you were working

14  on June 23, 2007.

15     A    I was working the evening shift which

16  would begin 5:00 o'clock p.m. and I was working

17  until 5:00 o'clock a.m.

18     Q    May I direct your attention to

19  approximately 10:00 o'clock that evening, did you

20  receive an assignment?

21     A    Yes.

22     Q    What was the assignment that you received?

23     A    I was assigned to go to Area 5 as part of

24  an investigation into a shooting that had occurred.

80

1    Q    After receiving that assignment, did you,

2  in fact, go to Area 5?

3    A    Yes, I did.

4    Q    Do you recall approximately what time you

5  had arrived at the police station at Area 5?

6    A    I believe I arrived there at approximately

7  10:30 in the evening.

8    Q    When you arrived, what did you do?

9    A    When I first arrived, I sought out the

10  detectives who were assigned to the case.  I spoke

11  with a Detective Jim Gilger who was one of the

12  detectives on the case.

13       He apprised me of the basic details of what was

14  going on, provided me with whatever preliminary

15  reports that had been prepared, and I began to

16  review those reports.

17    Q    After you spoke with Detective Gilger and

18  reviewed those reports, what did you do?

19    A    After I had spoken to the detective and

20  reviewed the reports, I asked whether any of the

21  witnesses who were there to this event were

22  available to be interviewed.  He advised me that

23  they were so I began interviewing witnesses.

24    Q    Did anyone, was anyone present while you

81

1    interviewed the witnesses on this case?

2        A    Detective Gilger was present while I

3    interviewed all the witnesses on this case.

4        Q    Where did those interviews take place?

5        A    They took place in Area 5.  I don't recall

6    where each of them specifically took place.   I

7    interviewed the victim as well as a number of other

8    of witnesses.  They all would have been interviewed

9    in the detective division of Area 5 but some of them

10   were interviewed in different locations than others.

11       Q     Specifically, did you interview a witness

12   Charlene Cooper?

13       A    Yes, I did.

14       Q    Artherine Kelly?

15       A    Yes.

16       Q    Arnold Wysinger?

17       A    Yes.

18       Q    And Michelle Cooper?

19       A    Yes.

20       Q    You also indicated you did interview the

21   victim Commander Alphonso Wysinger?

22       A    Yes, I did.

23       Q    Was Detective Gilger present for all of

24   those interviews?

82

1    A   Yes, he was.

2    Q   After those interviews were concluded,

3  what did you do next?

4    A   After I had conclused my interviews with

5  all of the witnesses and all of the victim, the

6  victim in this case, I would have spoken to the

7  defendant.

8    Q   And where did you speak with the

9  defendant?

10    A   I spoke with the defendant initially in an

11  interview room at Area 5.

12    Q   Was that interview room on the second

13  floor at Area 5 Police Headquarters?

14    A   Yes, it was.

15    Q   Do you recall the approximate time that

16  you spoke with the offender in this case?

17    A   I believe I began my conversation with the

18  defendant at approximately 12:55 in the morning.

19    Q   And that would have been now June 24 of

20  2007?

21    A   That is correct.

22    Q   Was anyone present for that interview?

23    A   Detective Gilger was present for that

24  interview.

83

1    Q    And the individual that was in that

2    individual room in custody on this case, do you see

3    that person in the courtroom today?

4    A    I do.

5    Q    Could you please point to him and describe

6    an article of clothing?

7    A    Certainly.  It's the gentleman seated at

8    counsel table in the tan Department of Corrections

9    outfit.  He's sitting immediately to my left of

10   counsel.

11        MS. FALAGARIO:  May the record reflect

12   in-Court identification of the defendant Augeuste

13   Burton?

14        THE COURT:  Yes.

15   BY MS. FALAGARIO:

16   Q    What was the first thing that you said to

17   the defendant Augeuste Burton?

18   A    When I first entered the interview room, I

19   introduced myself to him.  I told him my name was

20   Kevin Nolan, that I was an Assistant State's

21   Attorney that that means that I was a lawyer and a

22   prosecutor but not his lawyer or the lawyer for

23   anybody else who is involved in this case.

24

                              84

1    Q    Did he indicate to you that he understood

2   who you were?

3    A    Yes, he did.

4    Q    After introducing yourself to the

5   defendant, what did you do?

6    A    I told him that I'd like to talk to him

7   about the events of that evening but first I was

8   going to read him his Miranda warnings.

9    Q    Did you, in fact, read him his Miranda

10  warnings?

11   A    I advised him of his Miranda warnings.  I

12  did not, in fact, read them, I recited them to him

13  from memory.

14   Q    Can you demonstrate to us now how you

15  recited those rights from memory to the defendant?

16   A    Certainly.  I asked the questions for each

17  of the rights and I waited for his response to each

18  of the question so the first thing I asked him was

19  whether or not he understood he had the right to

20  remain silent.  He responded that he did understand

21  that.  He said yes.

22       I then asked him if he understood that if he

23  gave up the right to remain silent that anything he

24  did say could be used against him in a court of law.

85

1    I asked him if he understood that.  He

2  responded yes, he did understand that.

3    I asked him if he understood he had the right

4  to have an attorney and he could have an attorney

5  present with him for any questions.

6    I asked him if he understood that right.  He

7  indicated yes, he did understand that right.

8    I then asked him if he understood if he could

9  not afford an attorney one will be appointed to him

10  for free.

11    I asked him if he understood that right.  He

12  indicated yes, he did understand that right.

13    Q    After the defendant indicated to you that

14  he understood his rights, what did you ask him?

15    A    I then asked him if understanding each of

16  the rights that I've just explained to you are you

17  willing to talk to me.

18    Q    What did he say?

19    A    He said he was.

20    Q    Did he, in fact, talk to you about the

21  shooting that happened earlier that evening?

22    A    Yes.

23    Q    Did he, in fact, make a statement

24  specifically told you the facts about what had

86

1     happened earlier?

2     A    Yes, he did.

3     Q    Approximately, how long was that

4     conversation?

5     A    That conversation lasted approximately a

6     half hour.

7     Q    Was Detective Gilger present for that

8     conversation?

9     A    Yes, he was.

10     Q    After the oral conversation with the

11     defendant and Detective Gilger present, what did you

12     do?

13     A    After that conversation I exited the

14     interview room. I made a phone call to one of the

15     deputy supervisors that was on call. I had a brief

16     conversation with the deputy supervisor. I then

17     returned to room with the intention of taking a

18     handwritten statement from the defendant if he was

19     inclined to give one.

20     Q    And what did you do?

21     A    I told him that I was interested in taking

22     a handwritten statement from him. I advised him of

23     what that entailed exactly.

24     I told him that it would be just like the

87

1    interview that we just had.  I would ask him

2    questions.  He would give me answers.  I would write

3    down his responses to my questions.  It would be his

4    statement.  When I was done writing out the

5    statement, he would have an opportunity to review

6    that statement and to make any changes that he felt

7    like he needed to make.

8        Q    Did the defendant respond to you when you

9    described or explained to him what a handwritten

10   statement was?

11       A    Yes.  He said that he would be willing to

12   give a statement.

13       Q    Now, did the defendant ever indicate to

14   you that he had been mistreated while at the police

15   station?

16       A    No, he did not.

17       Q    Did he indicate that Detective Gilger had

18   struck him in any way?

19       A    No.  He never said such a thing.

20       Q    Did he indicate that Detective Gilger had

21   threatened him to make fa statement towards you?

22       A    No.

23       Q    After the defendant agreed to give a

24   handwritten statement, what did you do?

88

1      A      After he agreed to give the statement, I

2   conferred with the Detective Gilger so that we could

3   find a more suitable location for actually taking

4   the statement.  The interview room that we were in

5   didn't have a table or any sort of writing surface.

6      So after conferring with Detective Gilger, we

7   relocated to an office still on the second floor of

8   Area 5.  It was in one of the suite of offices that

9   didn't have a desk that I could write on.

10     Q      And was the defendant taken into that

11  room?

12     A      Yes, he was.

13     Q      Now, directing you to approximately 1:40

14  that morning, June 24, 2007, what did you begin to

15  do?

16     A      At that time I began to write the

17  handwritten statement?

18     Q      Who was present while you began to write

19  out the statement?

20     A      Myself, the defendant, and Detective

21  Gilger.

22     Q      Approximately, how long did it take you to

23  the actually writing of the statement?

24     A      I would say approximately an hour to hour

89

1    an hour and 15 minutes.

2        Q    Can you describe for us how you wrote out

3    the statement?

4        A    Certainly.  The statements are on the

5    preprinted forms.  There is a preprinted front page

6    for every statement that includes blank lines to

7    fill in basic information pertinent to the case.

8        There's a section immediately beneath that that

9    is a printed version of the same Miranda warnings

10   that I had given the defendant and then there was a

11   series of blank lines beneath that.

12       I began by filling out the pertinent

13   information at the top of the statement indicating

14   whose giving the statement, the date and time that

15   he's giving the statement, the location that he's

16   giving the statement, who was present for the

17   statement, and then information specific to the

18   offense, what the offense charge was, technically

19   not charged at that point, but what the nature of

20   the investigation was and the date and time and

21   location of the incident.

22       Q    I'm going to show you what's marked as

23   People's Exhibit 1.

24       Showing it to counsel.

90

1        I'm going to you the document that's marked

2   People's Exhibit No. 1, could you please take a look

3   and tell me if you recognize that document?

4        A    This is the statement that I took from the

5   defendant, Augueste Burton, on the 24th of

6   June 2007.

7        Q    Now, you just described for us the heading

8   where you include who was present the time that the

9   statement was taken as well as the offense?

10       A    Yes.

11       Q    What is listed as the offense in this

12   case?

13       A    Listed as the offense is attempt murder.

14       Q    Can you read the heading section regarding

15   the statement out loud.

16       A    Starting at the very top or starting --

17       Q    Regarding this offense.

18            MS. ATCHERSON:  Objection, I don't see the

19   relevance.

20            THE COURT:  How's all of this relevant?

21            MS. FALAGARIO:  There's an allegation,

22   Your Honor, that the defendant received the material

23   misrepresentation that he was in custody for first

24   degree murder.

91

1          THE COURT:  Okay.  I think she's talking

2     about the specific portions you're reading now.  Am

3     I right, Ms. Atcherson?

4          MS. ATCHERSON:  Yes.  The allegation in

5     the motion was that that was a misrepresentation

6     made by transporting officer.

7          MS. FALAGARIO:  Correct, Judge.  With the

8     allegation of general coercion in this case, at some

9     point during his contact at the police station if

10    he's advised what this statement is regarding I

11    think it goes to the lack of a coercive nature

12    during the investigation.

13         THE COURT:  Because he's advised why he's

14    there?

15         MS. FALAGARIO:  Yes.

16         THE COURT:  I disagree.  Objection's

17    sustained.

18    BY MS. FALAGARIO:

19    Q    Now, the first page of the handwritten

20    statement that include the Miranda warnings, is that

21    correct?

22    A    Yes, it does.

23    Q    And what, if anything, did you do

24    concerning the Miranda warnings?

                              92

1     A   I asked the defendant to read that section

2  out loud.  The purpose of that was twofold to again

3  admonish him of his Miranda warnings and to

4  demonstrate to me that he was able to understand the

5  written English language.

6     Q   Was he, in fact, able to read the Miranda

7  warnings out loud?

8     A   Yes, he was.

9      MS. ATCHERSON:  Again, I don't think that

10  goes to the allegations in the motion.  The

11  allegations don't include born out by Assistant

12  State's Attorney Nolan.

13      THE COURT:  I agree but I think there's

14  testimony that the detective was present and there's

15  the issue about Miranda so over your objection, I

16  will allow a little inquiry as to this part.

17    You may proceed.

18  BY MS. FALAGARIO:

19     Q   After the defendant read that paragraph

20  out loud, did you ask the defendant to do anything?

21     A   I asked him to sign the blank line

22  immediately beneath the written Miranda warnings.

23     Q   Did he, in fact, sign below the Miranda

24  warnings?

93

1     A    Yes, he did.

2     Q    So you indicated the taking of the

3  statement you actually writing out the statement

4  took over an hour, is that correct?

5     A    Approximately yes.

6     Q    After you wrote out the statement, what

7  did you do next?

8     A    After I had written out the defendant's

9  account of the incident that occurred on the evening

10  of June 23, he and I, with Detective Gilger present,

11  reviewed the statement to make sure that it was, in

12  fact, accurate.

13     Q    When you were writing out the statement

14  you indicated you documented the defendant's

15  account, describe how you did that?

16     A    Well, I had already, he had already given

17  me during my previous roughly half hour interview

18  with him broad outline of his conduct that evening.

19  This time I was asking more specific questions so I

20  would ask him questions and he would give me answers

21  and as he would give me the answers I would write

22  down his responses.

23     Q    A writing out the statement, what did you

24  do next?

94

1    A    After writing out the statement, the

2  defendant and I reviewed the statement again with

3  Detective Gilger present to determine whether or not

4  what I had written down was, in fact, accurate and

5  what he had said to me.

6    Q    Can you describe how you reviewed the

7  statement with the defendant?

8    A    Yes.  I gave him the option of either

9  reading the statement out loud himself or having me

10  read it out loud to him.  And he elected to have me

11  read the statement out loud to him and then I

12  positioned myself so that he could see what I was

13  reading as I read and we went through the statement

14  together.

15    I told him that if at any point I read

16  something that was not accurate or misprinted or I

17  misunderstood him that he should stop me and we

18  would make any changes or deletions that were

19  necessary.

20    Q    During your review of the statement, did

21  the defendant stop you at any point to make any

22  changes, corrections, or additions?

23    A    Yes.

24    Q    Were those changes, corrections, or

95

1    additions then made on the statement?

2        A    Yes.

3        Q    What, if anything, did you do after a

4    change or addition was made to the statement?

5        A    Anytime there was a change, a deletion, or

6    an addition, I had the defendant, myself, and

7    Detective Gilger initial those changes.

8        Q    Now, you referred to the defendant's

9    signature under the Miranda warnings, did the

10   defendant sign the statement in any other locations

11   during the review of the statement?

12       A    Yes, he did.  The defendant signed the

13   bottom of each of the seven pages of the statement.

14   He also signed the two exhibits that were attached

15   to the statement and he also signed Polaroid

16   photograph that was attached to the statement.

17       Q    Did you also sign every page of that

18   document People's Exhibit No. 1?

19       A    Yes, I did.

20       Q    And the document that's in front of you,

21   People's Exhibit No. 1, is that, in fact, the

22   original statement that you took from the defendant

23   on June 24th of 2007?

24       A    Yes, it is.

                                             96

1    Q    Is that -- strike that.

2         What did you do after the review was concluded

3    of the statement?

4    A    After the review of the statement was

5    concluded, I wrote an additional paragraph that was

6    basically a summary of everything that we had just

7    done.  That paragraph indicates the defendant was

8    able to understand, read and write the English

9    language.  It described the process that we just

10   went through.  The review of the statement, the

11   defendant was given the opportunity to make changes,

12   and where changes made everybody who was present

13   initialed those changes.

14   Q    Now, People's Exhibit No. 1, how many

15   pages is it?

16   A    The statement itself is seven pages.

17   There were two additional pages that contained

18   exhibits.

19   Q    Now, you referred to changes, corrections,

20   or additions.  On People's Exhibit No. 1, do you see

21   any of the changes, corrections, or additions that

22   are made to the document?

23   A    Yes,  I do.

24   Q    Could you please go to the first change or

97

1    correction that was made.

2        A    Yes.

3        Q    What page do you see changes or

4    corrections?

5        A    The first change or correction that I see

6    on the statement is on page two.

7        Q    What is the change on page two of the

8    document?

9        A    In the first paragraph --

10            MS. ATCHERSON:  Objection, I don't see

11   that this is relevant.

12            THE COURT:  I agree.  Objection is

13   sustained.

14   BY MS. FALAGARIO:

15       Q    I'm going to direct you now to page two of

16   the handwritten statement, final paragraph which is

17   listed on page 6, what is that paragraph concerning?

18       A    That paragraph is concerning the treatment

19   of the defendant while he was in custody at Area 5.

20            MS. FALAGARIO:  Judge, at this time I'm

21   going to ask that the witness be allowed to publish

22   the treatment paragraph which is contained on page

23   six of the document.

24            THE COURT:  What's your view on that, Ms.

98

1   Atcherson?

2        MS. ATCHERSON:  Well, I think the document

3   itself has been admitted.

4        THE COURT:  Have you moved for admission?

5        MS. FALAGARIO:  No, Judge.

6        MS. ATCHERSON:  An objection has been laid

7   for it.

8        THE COURT:  Well, I'm assuming if they're

9   going to move to have it admitted for purposes of

10  this hearing and my guess is I will probably admit

11  although I don't want to be premature on that.  But

12  if that's the case, I can read it myself.  I don't

13  need to have the assistant State's Attorney to read

14  it.  Would that be satisfactory?

15       MS. ATCHERSON:  I guess I would be

16  assuming that it would be admitted.

17       THE COURT:  I am too but I don't want to

18  put the cart before the horse until I hear what you

19  have to say.

20       I read the language myself.  Maybe we ought to

21  address the admissibility of it right now so we can

22  get to that.  Are you going to be asking to have

23  your, which I will call group 1 and 1A, admitted for

24  purposes of this hearing?

99

1          MS. FALAGARIO:  Yes, we are, Your Honor.

2          THE COURT:  Ms. Atcherson.

3          MS. ATCHERSON:  I have no objection.

4          THE COURT:  And I won't admit the entire

5     statement.  I'm just going to admit the portions

6     that are relevant to the motion and anything that's

7     germane to the motion.  I'm not going to review

8     anything else.  But that'll be admitted for purposes

9     of this hearing.

10          MS. FALAGARIO:  Thank you, Judge.

11     BY MS. FALAGARIO:

12     Q    Mr. Nolan's referring to People's Exhibit

13     No. 1A, which is stapled to the front of the

14     document that's before you, which is People's

15     Exhibit No. 1A.  People's Exhibit No. 1A, it's a

16     photo of the defendant Augueste Burton.  Who took

17     that photograph?

18     A    I took that photograph.

19     Q    And when during this procedure did you

20     take that photograph?

21     A    I took that photograph after the

22     completion of the handwritten statement.

23     Q    Does that photograph truly and accurately

24     reflect how the defendant appeared at the police

                          100

1   station?

2       A    Yes, it does.

3       Q    Approximately what time was it your

4   handwritten statement was completed with the

5   defendant?

6       A    I would say it was completed at

7   approximately 3:00 o'clock in the morning.

8       Q    During your contact with the defendant,

9   did he ever indicate to you that he was never

10  advised of his Miranda warnings?

11      A    No, he did not.

12      Q    Did he ever indicate to you, that being

13  the defendant, that he had asked for a lawyer?

14      A    No, he did not.

15      Q    Did he ever in your presence indicated

16  that he wanted a lawyer present on his behalf?

17      A    No, he did not.

18      Q    Did you tell the defendant at any time

19  what he was under arrest for?

20      A    I don't believe I ever solicitedly told

21  him he was under arrest for anything.  I wrote the

22  nature of the offense on a handwritten statement.

23  Beyond that I don't recall ever telling him you had

24  been arrested for any given offense.

101

1      Q    And the nature of the offense involved

2  what crime?

3      A    Attempt murder.

4      Q   Did the defendant ever indicate to you

5  that he was told by some police officers that he was

6  under arrest for first degree murder?

7      A    No, he did not.

8      Q    Did the defendant ever tell you that

9  Detective Gilger struck him in any manner during his

10  stay at the police station?

11      A    No, he did not.

12      Q    Did he indicate to you that Detective

13  Gilger struck him in any way?

14      A    No, he did not.

15      Q    Did he ever indicate that Detective Gilger

16  had threatened him?

17      A    No, he did not.

18      Q    Did you observe the defendant, did you

19  observe Detective Gilger strike or threaten the

20  defendant at any time?

21      A    No, I did not.

22      Q    Did you, in fact, asked the defendant how

23  he had been treated while at the police station?

24      A    Yes, I did.

102

1     Q    What did the defendant tell you?

2     A    He indicated that he had been treated

3  well.

4     Q    Did the defendant indicate to you whether

5  he was allowed to use the washroom?

6     A    He indicated to me that he was allowed to

7  use the washroom.

8     Q    Did you ask the defendant whether anyone

9  had threatened him while at the police station?

10    A    I did.

11    Q    What was his response?

12    A    He said nobody had threatened him.

13    Q    Did he indicate or have any complaints

14  whatever to you about his treatment?

15    A    No.  He never complained to me about his

16  treatment.

17    Q    During your conversation with the

18  defendant, did he ever admit to you that he shot at

19  in the direction of Commander Wysinger?

20    A    No, he did not.

21        MS. ATCHERSON:  Objection.

22        THE COURT:  Sustained.

23        MS. FALAGARIO:  Nothing further.

24

1                           **CROSS-EXAMINATION**

2      BY MS. ATCHERSON:

3          Q      Sir, you indicated that you had arrived

4      roughly 10:30 p.m. at Area 5?

5          A      That's correct.

6          Q      When you first arrived you spoke to

7      Detective Gilger?

8          A      Yes.

9          Q      And you learned of the basic details of

10     the events leading up to your arrival?

11         A      Yes, the basic details yes.

12         Q      You also had an opportunity to review

13     preliminary reports that had been prepared?

14         A      Yes.

15         Q      And that included reports regarding the

16     interviews of witnesses as taken place before you

17     arrived?

18         A      I don't suspect there would have been any

19     of those reports generated at that point.  I can't

20     think of any report that I would have seen at that

21     point that would have included that information.

22     The preliminary reports, preliminary interviews with

23     any of the other witnesses.

24         Q      You had been informed and reviewed general

                                  104

1    progress reports of an interview that had been taken

2    place with Mr. Burton prior to your rival?

3        A    I don't know that I would have reviewed

4    the general progress reports.  I don't recall

5    anybody telling me in great detail anything that he

6    had said up to that point and I don't recall

7    reviewing any general progress reports.

8        Q    Were you aware that he had been

9    interviewed prior to your arrival?

10       A    I'm sure I was aware that he had been

11   interviewed by somebody, if he had.  To be perfectly

12   honest, I don't.  I don't recall if anybody told me

13   explicitly that he had been interviewed at that

14   point.

15       Q    How long have you been working felony

16   review at that point?

17       A    I had been in felony reviewed for over a

18   year at that point.

19       Q    And one of the purposes of being on felony

20   review is to respond to stations to interview

21   potential witnesses?

22       A    Yes.

23       Q    And to interview possible offenders?

24       A    Yes.

105

1    Q    And would it be fair to say that when you

2  go to interview an offender you are looking to see

3  if they are going to make an admission to an event?

4    A    Certainly.

5    Q    And with that in mind, would it be

6  important to you when you respond to a station to

7  know what an offender had told other individuals

8  before you?

9    A    Well, yes and no.  In my experience what

10  offenders have to say tend to evolve during the

11  course of an investigation so certainly it would

12  have been pertinent information if I had it.

13    To be perfectly honest, I don't recall if

14  anybody had advised me when I had initially arrived

15  if he had been interviewed at that point.

16    Q    Well, at some point during this evening,

17  based on the information that you learned, you are

18  going to have to decide whether or not charges are

19  going to be approved against an offender,  is that

20  correct?

21    A    At some point during the course of the

22  evening I potentially not always depends on the

23  nature of the investigation and the progress of the

24  investigation.

106

1  Q But you are going to have to make a

2 decision about whether they're going to be approved

3 or not?

4  A Ordinarily yes not always though.

5  Q Would it be fair to say that the

6 consistency of an offender's statement while in

7 custody would be something you would look at to

8 determine whether you are going to approve charges?

9    MS. FALAGARIO:  Objection.

10    THE COURT:  Sustained.

11 BY MS. ATCHERSON:

12  Q Now, you stated that you went on to

13 actually conduct interviews with some of the

14 witnesses who were present at the station?

15  A Yes.

16  Q That was after you reviewed preliminary

17 reports?

18  A Yes.  I would have reviewed whatever

19 paperwork that investigating detective had available

20 at that point so I could have a general idea in my

21 head of the sequence of events and allegations that

22 were being made so that I can competently interview

23 all the witnesses that were present.

24  Q Now, where were you when you were

107

1   reviewing the preliminary reports?

2     A   I don't recall for certain.  I believe I

3   was in the, I was obviously in the Area 5, Detective

4   Division.

5     In the Area 5 Detective Division there was a

6   large open space that had a number of desks in it

7   where the detectives work, to the best of my

8   recollection I had just situated myself at one of

9   those desks and had my paperwork and the paperwork

10   that was given to me.

11     Q   And you read those documents by yourself?

12     A   Yes.

13     Q   Now, you're not aware who may have had

14   contact with Mr. Burton prior to your arrival at

15   Area 5?

16     A   Well, I suspect somebody had had contact

17   with him; otherwise, he wouldn't be there but I

18   don't know who that might have been.

19     Q   You don't know what events that may have

20   happened prior to your arrival regarding Mr. Burton?

21     A   No.

22     Q   You testified that Detective Gilger was

23   present when you interviewed these other witnesses?

24     A   Yes.

108

1     Q    Prior to your interview of Mr. Burton?

2     A    Detective Gilger was present with me for

3 those interviews.

4     Q    You are aware that those witnesses had

5 been interview by other detectives already?

6     A    Yes.  I would have been aware that

7 somebody had spoken to him.  I don't know exactly

8 what detectives had interviewed them.

9     Q    You didn't make any notes regarding your

10 interview with those witnesses?

11     A    The only thing I would have written would

12 have been the information on my felony review folder

13 concerning they're vital statistics and so on and so

14 forth.

15     Q    The content of their statements to you

16 would not be contained in any documents?

17     A    The content of their statements there

18 might have been small notes.

19     Q    Those notes would be in your felony review

20 folder?

21     A    Yes.

22     Q    Now, you also spoke to the complainant,

23 Commander Wysinger, prior to interviewing

24 Mr. Burton?

1       A    Yes.

2       Q    Did you take notes during that interview

3  with Commander Wysinger?

4       A    I wrote his basic information.  I don't

5  recall what I might have written on the felony

6  review folder.  What I would have written for any of

7  these witnesses would have been a summary of the

8  observations that they made, not necessarily the

9  statements that they made, but the observations that

10  they made so I could keep track of who saw what.

11       Q    You were aware that prior to your

12  interview, they were attempts being made to locate

13  two possible suspects who may have been involved a

14  in a shooting with Mr. Burton on Ferdinand?

15            MS. FALAGARIO:  Objection to the

16  relevance.

17            THE COURT:  Sustained.

18  BY MS. ATCHERSON:

19       Q    You indicated that there was a point after

20  your initial oral interview with Mr. Burton that you

21  left the interview room?

22       A    Yes.

23       Q    And you contacted an individual over the

24  phone?

110

1    A    Yes.

2    Q    You're not aware of who made contact with

3  Mr. Burton during the time you were outside of the

4  room?

5    A    I think I would have gone directly outside

6  of the interview room that he was in and I would

7  have seen the door to that interview room.  I don't

8  recall seeing anybody go in or come out but I can't

9  say for sure but I do know that I would have been

10  immediately outside his interview room.

11    Q    Now, you made reference to several things

12  that Mr. Burton did not mention.  You said that he

13  did not say that he had ever been threatened by a

14  police officer while at the station?

15    A    That's correct.

16    Q    And he had not been mistreated?

17    A    Correct.

18    Q    When you wrote that in the handwritten

19  statement, Detective Gilger was present?

20    A    When I wrote in the handwritten yes, all

21  three of us were present.

22    Q    And it would be fair to say that after you

23  left Mr. Burton was going to be still in the custody

24  of the detectives and law enforcement personnel at

1    Area 5?

2        A    After I left for the evening?

3        Q    Yes.

4        A    Presumably yes.

5        Q    Now, you said that you were aware that

6    other individuals had spoken to Mr. Burton prior to

7    your arrival.  Were you made aware of any written

8    document that showed that he waived his rights prior

9    to your arrival, waived his Miranda rights?

10       A    I was not aware of any written document

11   wherein he had waived his Miranda warnings.

12       Q    Had you ever met Mr. Burton before the

13   date of June 23, 2007?

14       A    Not to my knowledge.

15       Q    Did you indicate when you first came into

16   contact with Mr. Burton he was in interview room F?

17       A    I don't know what interview room.  It was

18   an interview room.

19       Q    This was an interview room approximately 8

20   by 10, metal bench?

21       A    Yes.

22       Q    Ring on the wall?

23       A    Yes.

24       Q    When you first saw Mr. Burton, was he

112

1    cuffed to the wall?

2        A    I don't recall.  He may have been when I

3    first came into contact with him.  I don't recall

4    whether he was uncuffed or not during my initial

5    conversation with him.

6        Q    And it was only for the handwritten when

7    you moved to this larger room that contains a desk?

8        A    When I took a handwritten statement, we

9    were in a different room.  I wouldn't say it was

10   necessarily larger, it was just a different room

11   that happened to have a desk.

12       Q    Was Mr. Burton ever allowed to use the

13   bathroom in your presence?

14       A    Was he allowed to go use the bathroom?

15       Q    Was he made a request and was taken --

16       A    I don't recall.

17       Q    Was he given anything to eat or drink in

18   your presence?

19       A    He may have been.  I specifically know

20   that on the handwritten that he had juice to drink.

21   I don't know if that was based on his having told me

22   or whether I was present when he was drinking it.

23       Q    You don't have any recollection of him

24   being given anything to or drink in your presence,

113

1   correct?

2       A   I don't recall whether he did or didn't.

3           MS. ATCHERSON:  Nothing further.

4           THE COURT:  Redirect?

5           MS. FALAGARIO:  Briefly, Your Honor.

6                   **REDIRECT EXAMINATION**

7   BY MS. FALAGARIO:

8       Q   Mr. Nolan, at any point during your oral

9   conversation with the defendant was he handcuffed?

10      A   I don't recall whether he was or not.  I

11  think that he would have been uncuffed, I would have

12  asked the detective to uncuff him for that

13  conversation.

14      Q   Do you recall speaking to him at any time

15  while he was handcuffed?

16      A   I don't.

17          MS. ATCHERSON:  Objection, asked and

18  answered.

19          THE COURT:  It's a different question.

20  It'll stand.

21          MS. FALAGARIO:  Nothing further, Your

22  Honor.

23          THE COURT:  Anything based on that, Ms.

24  Atcherson?

                            114

1        MS. ATCHERSON:  No.

2        THE COURT:  Thank you, sir.  You may step

3  down.

4        MS. FALAGARIO:  Judge, for the record we

5  are again moving People's Exhibit No. 1 with

6  People's Exhibit No. 1A.

7        THE COURT:  I think they're in so that

8  just leave two, Group exhibits 2 through A through

9  is it F.

10        MS. FALAGARIO:  Yes.  At this point we are

11  moving into evidence those exhibits 2A through 2F.

12        THE COURT:  What's your position on that,

13  Ms. Atcherson?  That's the photo?

14        MS. ATCHERSON:  Photos.  I don't have no

15  objection.

16        THE COURT:  Those will be admitted for the

17  purpose of this hearing only.

18      State rest?

19        MS. FALAGARIO:  Yes, with the admission of

20  our exhibits, People rest.

21        THE COURT:  Ms. Atcherson.

22        MS. ATCHERSON:  Judge, I would make a

23  motion for a directed finding in the sense that the

24  State did have the burden.  I don't believe that

115

1    they have overcome.

2          THE COURT:  Well, they have the burden of

3    going forward.

4          MS. ATCHERSON:  Going forward and shifting

5    the burden back to I'm saying that they have not.

6          THE COURT:  Well, I make a finding now

7    that they have met at least that aspect of their

8    burden going forward.

9          MS. ATCHERSON:  Your Honor, after

10   conferring with Mr. Burton, we will be resting on

11   the motion.

12         THE COURT:  All right.  Argument.  Let me

13   take a minute just to review what I think are the

14   pertinent portions of People's Exhibit No. 1 and

15   then I will give each side an opportunity to address

16   me.

17      All right.  Both sides ready?

18         MS. FALAGARIO:  Yes, Your Honor.

19         THE COURT:  You may proceed.  It's your

20   motion.

21      CLOSING ARGUMENT BY MS. ATCHERSON:

22      Judge, you've had an opportunity to review the

23   allegations in our motion and to hear the witnesses

24   testify.

116

1       You've heard that this is an investigation

2   involving a shooting where the complainant is a

3   commander of the same district on which the shooting

4   allegedly took place.

5       And based on that we already have a situation

6   where there is a heightened level of police

7   certainly involvement and emotions with regard to

8   the police department.

9       The officers who responded who are involved in

10   this case are under the command of the person who is

11   allegedly the victim or the complainant in the case.

12       I think that it is under those circumstances

13   not believable to think that Officer Deady and his

14   partner would have absolutely nothing to say to

15   Mr. Burton during his detention or the transport

16   down to Area 5 that you've heard that the lead

17   detective in this case basically saying that lead

18   detective but he didn't have any contact with

19   Mr. Burton before a State's attorney was also

20   present and I don't think that that is credible

21   either and the photos that you have into evidence as

22   People's Exhibit 2, includes photos of Mr. Burton's

23   face.

24       I'm not going to state that they showed major

117

1   injuries but I do think that it shows that there's

2   some swelling to his face. If you take a look at

3   how he appears today and how he appears in that

4   photo there does appear to be some swelling to his

5   face in the photos that have been admitted.

6           THE COURT: Specifically which photo are

7   you referencing, Counsel?

8           MS. ATCHERSON: The head shot, 2A.

9           THE COURT: Okay.

10          MS. ATCHERSON: I think there's also a

11  profile on --

12          THE COURT: 2B because.

13          MS. ATCHERSON: It's somewhat blur but

14  those will be the two head shots that are in

15  evidence.

16          You have allegations that there are interviews

17  taking place with other witnesses that have not been

18  documented with the general progress report in the

19  presence of the State's attorney and Detective

20  Gilger. But there are some gaps in time, Judge,

21  where Detective Gilger was not with State's Attorney

22  Nolan and was not interviewing some other witness

23  and it is not inconceivable that he had contact with

24  Mr. Burton and would have as a lead detective sought

118

1    to have contact with Mr. Burton prior to a State's

2    attorney being involved in interviews with him.

3       I think that, I think that -- strike that,

4    Judge.

5       I think that based on what you've heard, the

6    credibility of the witnesses that you've heard

7    testify considering the type of investigation and

8    the people involved in the investigation is suspect

9    and that the motion should be granted.

10       It was a interview initially that took place in

11    the interview room F where everyone has stated

12    there's a bench either there's a bar to be cuffed on

13    the bench or a ring on the wall.  Detective Deady

14    said he did cuff Mr. Burton to either the bench or

15    the wall although Detective Gilger and Detective

16    Kolman claim that he was not cuffed.

17       You even heard State's Attorney Nolan say that

18    it was possible that he was cuffed when he initially

19    came into that interview room.

20       In fact, that was the (inaudible) of the

21    detective and police involvement they were

22    inconsistent with each other with regards to that

23    aspect that they would be untruthful regarding

24    further contact, particularly with regards to

119

1   Detective Gilger who currently has an investigation

2   complaint for this conduct pending in the

3   Independent Police Review Authority and is aware of

4   that at the time of his testimony and was aware of

5   the allegations made in both in that complaint and

6   in the motion.  That goes to his bias, Judge.

7           THE COURT:  Okay.  Thank you.  State.

8           CLOSING ARGUMENT BY MR. FAERMARK:

9       Judge, there's been no evidence presented to

10  support any of the allegations in defendant's

11  motion.

12      The first allegation is regarding Miranda, that

13  the defendant was not given his Miranda warnings

14  prior to detective questioning.

15      You heard testimony from Detective Kolman to

16  the contrary that he, in fact, advised the defendant

17  of his Miranda warnings.

18      It's interesting that point four of the motion,

19  the next allegation that he invoked his right to an

20  attorney so on the one hand the argument is I was

21  not given Miranda on the next paragraph is I invoke

22  my right to an attorney.

23      There's been no evidence to support any of

24  this, Judge.

                        120

1         THE COURT:  Well, I don't know necessarily

2    think those two are inconsistent, but you may

3    proceed.

4         MS. FALAGARIO:  All the evidence indicate

5    that the defendant was advised of his Miranda

6    warnings on three separate occasions by Detective

7    Kolman and by Assistant State's Attorney Kevin Nolan

8    on two separate  occasions.

9         On none of those occasions is there any

10   evidence to indicate that the defendant invoked any

11   of his constitutional rights to remain silent or to

12   consult or request an attorney.

13        The material misrepresentation, point five

14   doesn't make sense that the officer would tell him

15   that he's under arrest for first degree murder when

16   no one's killed in this incident.  The value of that

17   is weak at best.

18        Judge, People's Exhibit No. 1, 1A, 2A through F

19   all speak for themselves regarding the issue of

20   physical coercion.

21        The motion specifically states that Detective

22   Gilger first struck the defendant on the head

23   several times with his hand and later struck the

24   defendant on his side several times all the while

121

1    the defendant had one hand cuffed to the wall of an

2    interrogation room.

3         There's been no evidence to support those

4    allegations.  Counsel makes a point that he could

5    have happen that Detective Gilger could have had the

6    opportunity to go into the room by himself.

7         This motion can't be based on speculation and

8    based on what would could have happen, it can only

9    be based on the inferences from the witnesses that

10   have testified and the evidence you've received.

11        The evidence that you've received tells us that

12   the defendant stated in his handwritten statement

13   that he's been treated well by the police and ASA

14   Nolan and nobody has threatened or promised him

15   anything to give that statement.

16        Detective Gilger has testified and told us

17   about his job as the lead detective in this case.

18   And outlining what we did with his time.

19        He talked about he was in charge of the scene

20   and was on the scene for approximately two hours.

21        The Shooting occurred approximately

22   8:00 o'clock in the evening.  He is on the scene

23   waiting for a crime lab, securing the evidence,

24   waiting for photographs to take, be taken,

                              122

1    interviews to be conducted, a canvass to be done,

2    and all the evidence recovered in this case only

3    then does he return to Area IV.

4        In fact, Detective Kolman is specifically and

5    assigned to go to the area to see if the defendant

6    is talking and willing to give a statement.

7        While at Area 5, Detective Gilger explains to

8    us that the Assistant State's Attorney arrives.

9    That the witnesses are at the area and he is present

10   for those interviews, a total of six interviews,

11   taking again a substantial amount of time.

12       The defendant is finally interviewed by

13   Detective Gilger in the presence of Assistant

14   State's Attorney Kevin Nolan at approximately one

15   o'clock that morning.

16       The allegations regarding psychological and

17   mental coercion, again, there's no evidence to

18   indicate that the defendant was psychologically and

19   mentally coerced into giving this statement.

20       The evidence you've received indicates that

21   he's given this statement voluntarily and there's

22   nothing from testimony today that would indicate

23   otherwise.

24       He is in custody, Judge, for not a very long

123

1    period of time. He is processed at about three in

2    the morning. The shooting took place at 8:00 p.m.

3    so he is in Area 5 during this investigation for

4    approximately seven hours at the maximum.

5        Certainly just because he's in a small room at

6    a police station in custody for a case for seven

7    hours doesn't lead to the assumption that he must

8    have been psychologically and mentally coerced.

9        Based on the failure to support these

10    allegations, Judge, based on the credible evidence

11    that you have heard that we have presented we would

12    ask you to deny defendant's motion to suppress

13    statements.

14        THE COURT: Thank you, Mr. Falagario. Ms.

15    Atcherson, it's your motion. I'll let you have the

16    last say if you wish.

17        MS. ATCHERSON: Judge, I think I said most

18    of what I wanted to say but I would point out that

19    the handwritten itself really isn't very

20    constructive to you in that we didn't allege that

21    Mr. Nolan was involved in any --

22        THE COURT: I agree.

23        MS. ATCHERSON: So I don't think that it

24    can be used to rebut the allegations that are

1   contained in the motion. But clearly there is time

2   periods that are unaccounted for with regard to

3   Detective Gilger. And there is a very real reason

4   for him to have to deny any such allegations here

5   before Your Honor. Not just the typical ones that

6   would apply in general but that he has allegation

7   and complaint pending against him and we would ask

8   you to take that into consideration.

9                    JUDGE'S RULING:

10      Well, I don't find an allegation can prove

11  another allegation any more than I would think your

12  client was guilty of something simply because he was

13  accused of something of this nature in the past, I

14  don't think that necessarily follows.

15      I'm listening to the evidence and the

16  testimony, all the four of the State's witnesses,

17  the three police officers and State's attorney for

18  the minor involvement he may have had in this refute

19  and rebut each and every allegation that is raised

20  by client in this motion to suppress statements.

21      There's an argument made that because of the

22  nature of the victim that things might have been

23  done differently, I think the same argument can be

24  made because of the nature of the victim that the

125

1  police officers were intent on doing everything the

2  proper way so as not to jeopardize the case.

3      So I'm not going to surmise whether or not

4  Officer Deady spoke to your client and made

5  misrepresentation to him so I'm going to rely on his

6  under oath testimony that it's unrebutted.  He

7  clearly said that he did not do.

8      I listened to the same testimony by Officer

9  Gilger who responded that he didn't even speak to

10  your client prior to the arrival of the State's

11  attorney.  He only spoke to him in the presence of

12  the State's attorney.

13      You may not believe that that is credible but

14  that's his under oath testimony that has been you

15  unrebutted.

16      The photograph of your client, there's been no

17  testimony that People's Exhibit No. 2A indicate

18  there's any injury or any bruising or any swelling

19  whatsoever.  There's simply a photograph that's been

20  presented here.

21      No one has said that that's not how he looks.

22  The second photograph is fuzzy and I don't think

23  anything could be determined from that photograph

24  other than it's a profile so again I am relying on

126

1 the under oath testimony by the witnesses have been

2 unrebutted and uncontradicted in my view.

3  I find that the State's attorney's testimony,

4 and I agree with you to a degree that most of what

5 he testified to is not really germane to this

6 motion, however, I think the argument could be made

7 that a reasonable person would expect that if there

8 was another party there that a person who had been

9 wronged by the police would cry out or make some

10 complaints to the State's attorney who is not a

11 police officer and let him know that he had been

12 mistreated.

13  There was testimony I believe by Officer Gilger

14 that the State's attorney spoke to your client alone

15 and that would be an ample opportunity or a ripe

16 opportunity for your client to express these

17 conditions that he was submitted to by the police

18 and that wasn't done.

19  In any event, I guess in summary, I've listened

20 to all the testimony.  I don't think the testimony

21 is incredible.  I think it's believable.  It's my

22 view it was not contradicted.

23  Based on the testimony of the officers and the

24 Assistant State's Attorney, I find that each and

127

1    every allegations contained in the defense's motion

2    has been responded to and rebutted and as a result

3    the defendant's motion to suppress statements is

4    considered but it is hereby denied.

5        I'm going to return the exhibits back to the

6    State.   What's the next step for the parties?

7            MS. ATCHERSON:   Your Honor, we are in the

8    process of trying to complete our investigation.   I

9    have investigation request standing for quite

10   sometime I need to check in with my investigator to

11   see the status of that.

12           THE COURT:   All right.   I'll allow you to

13   do that --

14           MS. ATCHERSON:   I am going to be able to

15   file an answer.

16           THE COURT:   All right.   It's approaching

17   this two year anniversary in this case so I would

18   think that we should get this into a trial posture

19   or a resolution at some time within the near future.

20       How much times do you need to complete your

21   investigation and file your answer?

22           MS. ATCHERSON:   Judge, can I have a one

23   month status and I'm hoping that I can at least file

24   an answer.   I cannot guarantee that every

128

1    investigation avenue will have been exhausted at

2    that point.

3         THE COURT: At some point and time the

4    avenues have to be shut and we have to proceed,

5    otherwise, we can probably continue this long after

6    you've had retired from public service so what day

7    would you like?

8         MS. ATCHERSON: I'm looking at late April

9    early May.

10         THE COURT: I just point out to you as

11    this nears the two year anniversary, you run either

12    the benefit or the risk of having this going to

13    another Judge so keep that in mind.

14         MS. FALAGARIO: How's April 28th.

15         MS. ATCHERSON: That's fine.

16         THE COURT: Mr. Burton, I've denied your

17    motion. That's not the end of it though. Your

18    matter's continue to April 28 while your attorney

19    continues your investigation. I will sign a request

20    for you to, this is the first time I have ever done

21    this to allow you to you use the law library.

22         A

23         THE DEFENDANT: Thank you, Your Honor.

24         MS. ATCHERSON: April 28th by agreement.

1          THE COURT:  That's the order.  Thank you

2    everyone.

3       Court's in recess.

4            (WHEREUPON, the above-entitled

5            cause was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS  )
                       )
2    COUNTY OF COOK    )

3

4    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

5      CRIMINAL DEPARTMENT/CRIMINAL DIVISION

6

7        I, Gail Duff, an Official Court Reporter

8    for the Circuit Court of Cook County, Criminal

9    Department, do hereby certify that I reported in

10   shorthand the proceedings had at the hearing of the

11   above-entitled cause; that I thereafter caused the

12   foregoing to be transcribed into typewriting, which

13   I hereby certify to be a true and correct transcript

14   of the proceedings.

15

16   _____

17       Official Court Reporter

18       084-003875

19   Dated this 29th

20   of July, 2009.

21

22

23

24

131